**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION**

| | | |
|---|---|---|
| **VISTA BANK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Civil Case No:** |
| **FIRST BANCSHARES OF TEXAS, INC,** | ) | |
| **a Texas financial institution doing business** | ) | |
| **as FIRSTCAPITAL BANK OF TEXAS,** | ) | |
| **N.A., BRAD BURGESS, and KENNETH** | ) | |
| **L. BURGESS, JR.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORIGINAL COMPLAINT

Plaintiff Vista Bank ("Plaintiff" or "Vista") files this its Original Complaint against Defendant First Bancshares of Texas, Inc., d/b/a FirstCapital Bank of Texas ("Defendant" or "FirstCapital"), Brad Burgess ("B. Burgess"), and Kenneth L. Burgess, Jr. ("K. Burgess" and together with B. Burgess the "Burgess Brother Defendants" and with FirstCapital, collectively, the "Defendants"), and in support thereof, would respectfully allege as follows:

### I.
### PRELIMINARY STATEMENT

This action arises from FirstCapital knowingly facilitating and supporting the continuation of a multi-million dollar check kiting scheme initiated by the Reagor-Dykes entities[1] to enable FirstCapital to continue to collect fraudulent deposits, while actively pushing fraud losses onto Vista through a system of mass check returns. Vista files this lawsuit to recover more than

---

[1] "Reagor-Dykes" entities include Reagor-Dykes Motors, LP (dba Spike Dykes Ford Lincoln, Reagor Dykes Auto Mall of Midland, Prime Capital Auto Lease – Lamesa, Prime Capital Auto Lease – Midland), Reagor-Dykes Floydada, LP, Reagor-Dykes Plainview, LP, Reagor-Dykes Auto Company, LP, Reagor-Dykes Amarillo, LP, Reagor-Dykes Imports, LP, and other related and affiliated entities.

$6,000,000.00 in damages maliciously inflicted by FirstCapital and the Burgess Brother Defendants through improper use of non-public, material inside information. FirstCapital and the Burgess Brother Defendants obtained insider knowledge through a close relationship with Rick Dykes, an owner in the Reagor-Dykes entities and former Board Member of FirstCapital. Using this non-public information, FirstCapital benefited from the continuation of the Reagor-Dykes' check kiting scheme at Vista's expense. By this Complaint, Vista seeks redress for the substantial harm incurred because of FirstCapital's unlawful conduct.

## II.
## PARTIES

**A.**      **Plaintiff**.

1.      Plaintiff Vista Bank is a Texas financial institution duly formed and existing under the laws of the State of Texas. Vista maintains its principal office in Lubbock, Texas.

**B.**      **Defendants**.

2.      Defendant First Bancshares of Texas, Inc., d/b/a FirstCapital Bank of Texas, N.A. is a Texas financial institution and may be served through its registered agent for service, Michael Jackson Canon located at 310 West Wall St., Suite 1200, Midland, Texas 79701, or wherever he may be found.

3.      Defendant Brad Burgess is an individual and a resident of the State of Texas. B. Burgess may be served with process at 8611 Indiana Avenue, Lubbock, Texas 79413, or wherever he may be found.

4.      Defendant Kenneth L. Burgess, Jr. is an individual and a resident of the State of Texas. K. Burgess may be served with process at 805 North Big Spring, Midland, Texas 79701, or wherever he may be found.

### III.
### JURISDICTION AND VENUE

5.      Jurisdiction in this Court is proper pursuant to 28 U.S.C § 1331 because Vista's claim for

violation of the Federal Reserve System issued Regulation CC, arise under federal law. This Court

has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Vista's state law claims because

those claims are so related to the federal claims that they form part of the same case or controversy.

6.      Pursuant to 28 U.S.C. § 1391, venue is proper in the United States District Court for the

Northern District of Texas, Lubbock Division, because a substantial part of the events or omissions

giving rise to the claims asserted herein occurred within this district and division, and the Court

has personal jurisdiction over Defendants.

### IV.
### RELEVANT FACTUAL BACKGROUND

**A.     The Check Clearing Process and How it Should Work**.

6.      An understanding of the normal check clearing process between banks provides context to

the severity and wrongfulness of Defendants' actions against Vista.

7.      <u>Payor Bank and Collecting Bank</u>. When a banking customer deposits a check (also referred

to as an "item") drawn from her account at one bank (the payor bank, "Bank 1"), into her account

at another bank (the collecting bank, "Bank 2"), the two banks work with the United States Federal

Reserve Bank of Dallas (the "Federal Reserve") to transfer account funds from Bank 1 to Bank 2

to clear the item. For example, when Ms. Smith writes a $100.00 check from her account at Bank

1 and deposits this $100.00 check into her account at Bank 2, Bank 2, as the collecting bank, sends

the $100.00 deposited item to Bank 1, the payor bank, through the Federal Reserve cash letter

system, as explained below.

8.      <u>The Cash Letters</u>. Funds related to items change hands among different banks though cash letters issued to and from the Federal Reserve. The cash letters a bank sends to the Federal Reserve are "outgoing" cash letters and include all items deposited at that bank which are payable by other banks. The cash letters the Federal Reserve sends to a bank are "incoming" cash letters and list of the items payable by that bank which were deposited at other banks.

9.      A collecting bank, in this example Bank 2, holding a deposited item payable by Bank 1, includes the item as part of an outgoing cash letter to the Federal Reserve. The outgoing cash letter requests funds from the payor bank (Bank 1) from the account the item is drawn on. Bank 2's outgoing cash letter will include multiple items it holds related to transactions involving other banks.

10.     Upon the Federal Reserve's receipt of Bank 2's outgoing cash letter, it uses the listed items' routing numbers to determine which financial institutions should pay the items to Bank 2 (e.g., for Ms. Smith's check, Bank 1 needs to pay Bank 2). The Federal Reserve then prepares an incoming cash letter to Bank 1 listing all of the items submitted for payment from accounts held at Bank 1, including Ms. Smith's check for $100.00.

11.      When Bank 1 receives the Federal Reserve's incoming cash letter, Bank 1 pairs the listed items with the correct accounts and subtracts the indicated amounts from those accounts using the account number printed on each item; however, if Bank 1 is unable to or refuses to pay any item on the incoming cash letter for a valid reason as defined by the Federal Reserve (e.g., the item is subject to a stop payment, a frozen account, or an account with insufficient funds to cover the full item amount), Bank 1 may return the check to Bank 2 as "not paid" by including the item on an outgoing return cash letter to the Federal Reserve.

12.     The Federal Reserve receives Bank 1's outgoing return cash letter and issues an incoming return cash letter to Bank 2, listing all "not paid" return items for which Bank 2 had requested payment.

13.     When Bank 2 receives the incoming return cash letter, it will include a front and back copy of each returned check. Using the incoming return cash letter's check copy, Bank 2 determines which account initially received credit for the returned check when originally deposited, and then subtracts the money from the account using a process called chargeback.

14.     The Chargeback Process. A "chargeback" reverses any account credit the collecting bank (Bank 2) previously provided to the depositing account holder for a returned item, forcibly removing funds from the account into which the item was deposited. Specifically, a chargeback is the reversal of a prior outbound cash letter and any related transfer of funds into a customer's bank account.

15.     The Federal Reserve requires that the chargeback process occur within four days of the item being negotiated at Bank 2 for the return to be considered timely:

> Day 1: Ms. Smith deposits the check from Bank 1 into her account at Bank 2, and Bank 2 sends the resulting outgoing cash letter to the Federal Reserve, providing a credit to Ms. Smith's Bank 2 account increasing the balance by the amount of the check.

> Day 2: Bank 1, as the issuing bank, receives the incoming cash letter from the Federal Reserve, and the amount of the item on the check is subtracted from Ms. Smith's Bank 1 account.

> Day 3: If Bank 1 decides not to pay the item and return it to Bank 2 as unpaid, Bank 1 lists the returned items on its outgoing cash letter to the Federal Reserve.

> Day 4: Bank 2 receives the incoming return cash letter from the Federal Reserve containing all items that were not paid. Bank 2 reverses the credit in Ms. Smith's Bank 2 account, reducing the account balance by the amount of the check.

16.     Any item Bank 1 returns outside of the four-day process described above is considered a late return under the Uniform Commercial Code ("UCC") and Federal Reserve guidelines,

normally preventing Bank 1 from avoiding paying the item to Bank 2. This process is further illustrated in the graphic below:



**B.   How a Check Kiting Scheme Exploits the Check Clearing Process**.

17.   <u>Check Kiting</u>. Check kiting is a form of check fraud that exploits the chargeback time frame. When a collecting bank (Bank 2) receives deposit of an item, it increases the available balance in the customer's account by the item amount; however, the collecting bank will not receive actual funds on account of the item until the check clearing process is completed through cash letters with the Federal Reserve and payment by the payor bank (Bank 1). If the account holder withdraws funds credited to her account for an item before the payor bank receives the incoming return cash letter returning that item, the account holder can receive cash on the account of the returned item, even where the item has no cash value due to Bank 1's refusal to pay on the item.

18.     Check kiting allows the account holder to withdraw non-existent funds from their account. In this way, instead of being used as a negotiable instrument, checks are misused as a form of unauthorized and fraudulently procured credit.

19.     Check kiters use accounts at two or more banks, intentionally writing worthless checks from their unfunded account at the payor bank (Bank 1) and depositing these "bad" checks into their account at the collecting bank (Bank 2). In the two to three days before Bank 1 returns the deposited item, Bank 2 has increased the balance in Ms. Smith's account, allowing Ms. Smith to withdraw $100.00 on the account into which the item was deposited. When Bank 2 receives the incoming return cash letter and charges back Ms. Smith's account, there is nothing in the account to fund the chargeback. As a result, Bank 2 has extended Ms. Smith $100.00 of credit on the account of the returned item.

20.     As detailed below, Reagor-Dykes perpetrated a multi-million dollar check kiting scheme. FirstCapital leveraged its insider connections with Reagor-Dykes ownership and management to game the system to allow FirstCapital to continue to collect on fraudulent deposits, while imposing the resulting losses, totaling over $6,000,000.00, onto Vista.

### C.   The Reagor-Dykes Check Kiting Scheme against Vista.

21.     Reagor-Dykes utilized its close relationship and multiple accounts with FirstCapital to execute a massive check kiting scheme against Vista. Reagor-Dykes implemented its check kiting scheme through serial multi-million-dollar check deposits among its accounts at FirstCapital, Vista and other banks. However, as detailed below, FirstCapital exploited its special insider relationship with Dykes—Reagor-Dykes' co-owner and FirstCapital Advisory Board Member, major shareholder, and former Director—to improperly shift the scheme's fraud and cause injury to Vista.

22.     Initially, the Reagor-Dykes scheme resembled the example detailed above. Reagor-Dykes management maintained multiple checking accounts at multiple financial institutions, including accounts at FirstCapital and Vista. Reagor-Dykes initiated a practice of regularly writing and depositing a high-volume of large denomination checks among these accounts.

23.     Reagor-Dykes wrote multi-million-dollar checks from FirstCapital accounts, deposited these checks into Vista accounts, and then issued payments from the Vista accounts based on these deposits to cover obligations or make deposits to their accounts at another financial institution. In doing this, Reagor-Dykes obtained millions of dollars in unauthorized credit from Vista during the "float" period while Vista completed the cash letter process with the Federal Reserve and waited for FirstCapital to fund the deposited items.

24.     The scheme's cycle of deposits and fraudulent float credit survived only if Reagor-Dykes maintained the volume and speed of its deposit cycle to keep ahead of the check clearing and cash letter process; however, a disruption such as Reagor-Dykes filing bankruptcy would cut the cycle, reveal the fraud, and lead Vista to freeze its Reagor-Dykes accounts. Vista would return the items Reagor-Dykes wrote on its Vista accounts and initiate returns on the FirstCapital checks Reagor-Dykes deposited to prevent unauthorized credit advances. And that's exactly what happened—except that FirstCapital found a way to use its insider access to Dykes to channel over $6,000,000.00 in losses and damages to Vista, allowing FirstCapital to knowingly profit from the scheme by continuing to accept funds from fraudulent deposits while implementing mass returns and chargebacks onto Vista.

### D. FirstCapital's Source of Insider Information.

25.     Rick Dykes ("Dykes") is a co-owner of Reagor-Dykes with Bart Reagor ("Reagor"). Reagor-Dykes is a well-known regional auto dealership enterprise, with locations throughout North and West Texas.

26.     Until just before Reagor-Dykes filed bankruptcy, Dykes served as a member of FirstCapital's Board of Advisors and previously held a seat as a Director on FirstCapital's Board of Directors. In fact, FirstCapital transitioned Dykes from a Director to its Board of Advisors to avoid banking regulatory scrutiny and potentially to increase the amount FirstCapital could lend Reagor-Dykes. Further, Dykes is a large FirstCapital shareholder, holding more than 350,000 of FirstCapital shares.

27.     Reagor-Dykes maintained active deposit accounts with Vista and FirstCapital, among other banking institutions.

### E. FirstCapital Leverages its Advisory Board Member, Major Shareholder, and Former Director, Rick Dykes, to Pin the Damages onto Vista.

28.     As noted above, Dykes held high management and key ownership roles at both Reagor-Dykes and FirstCapital, serving as Reagor-Dykes co-owner and FirstCapital Advisory Board Member, major shareholder, and former Director.

29.     On or before Saturday, July 28, 2018, Ford Motor Credit Company, LLC ("Ford"), Reagor-Dyke's largest inventory-lender notified Dykes of Ford's discovery of massive fraud and insolvency at Reagor-Dykes. Ford terminated Reagor-Dykes' funding, declared default, and threatened immediate legal action to, among other actions, seize Reagor-Dykes' assets.

30.     On Saturday, July 28, 2018, Dykes confided to a friend regarding Reagor-Dykes' insolvency and planned bankruptcy filing.

31.     On information and belief, Reagor-Dykes' management, including Dykes, worked with counsel through Monday, July 30, 2018 to appease Ford; however, no agreement was reached. Reagor-Dykes continued emergency bankruptcy preparations in anticipation of Ford's legal actions.

32.     On Tuesday, July 31, 2018, Dykes met with B. Burgess, FirstCapital's CEO, and K. Burgess, FirstCapital's Chairman, and warned FirstCapital and the Burgess Brother Defendants of Ford's impending legal action, Reagor-Dykes' severe financial problems, and Reagor-Dykes' planned bankruptcy filing. On information and belief, Dykes alerted no other creditors of these facts.

33.     Also, on July 31, 2018, Ford sued nine (9) Reagor-Dykes entities and Messrs. Reagor and Dykes in the U.S. District Court for the Northern District of Texas, Lubbock Division, alleging, among other counts, bank fraud and claiming tens of millions of dollars of damages.

34.     The next day, on Wednesday, August 1, 2018, six (6) of the nine (9) Reagor-Dykes entities filed petitions for bankruptcy protection. Lacking FirstCapital's insider access, Vista learned of the Reagor-Dykes bankruptcy through local Lubbock news reports and word of mouth.

35.     The timing of these events and FirstCapital's contemporaneous and highly irregular banking transactions detailed below establish that FirstCapital and the Burgess Brother Defendants used the inside information Dykes provided them to act against Vista, weaponized the check clearance process and systematically foisted over $6,000,000.00 in damages onto Vista to the benefit of the Defendants.

   **F.   FirstCapital Acts on Material, Non-Public Inside Information to Its Benefit and Vista's Harm**.

36.     Prior to Dykes providing FirstCapital and the Burgess Brother Defendants key material, inside, non-public information on the Reagor-Dykes fraud, bankruptcy planning and related

insolvency, FirstCapital timely cleared and paid Reagor-Dykes items deposited with Vista during normal hours, in a normal volume, with no chargebacks or anomalies. On July 31, 2018, FirstCapital, at the direction of the Burgess Brother Defendants, turned this process on its head, took Dykes' information and systematically targeted Vista with a flood of irregular returned and unpaid Reagor-Dykes items.

37.     As explained above, Reagor-Dykes used its numerous FirstCapital accounts to cycle a high volume of large dollar checks through its Vista accounts. As a result, Vista is party to numerous outgoing and incoming cash letters among FirstCapital and the Federal Reserve for Reagor-Dykes related checks.

38.     On Friday, July 27, 2018, Vista processed check items, including numerous Reagor-Dykes deposits, transmitting its outgoing cash letter to the Federal Reserve. On the next business day, Monday, July 30, 2018, the Federal Reserve provided the items to FirstCapital in an incoming cash letter.

39.     On a standard timeline, the following would have happened. On *Tuesday, July 31, 2018*, FirstCapital would have identified and returned any items from Vista's July 27th outgoing cash letter that FirstCapital could not, or refused, to pay by issuing an outgoing return cash letter to the Federal Reserve no later than midnight central standard time. Similarly, on *Wednesday, August 1, 2018*, no later than 2 p.m. central standard time, Vista would have received an incoming return cash letter listing FirstCapital's July 31st outgoing return cash letter items. FirstCapital deviated from this process in many important and telling ways.

40.     Acting on the damning inside information FirstCapital and the Burgess Brother Defendants received from Dykes on July 31st, FirstCapital, at the direction of the Burgess Brother Defendants, blew up the standard process and "worked all night" in a greedy attempt to ram return items onto

Vista as detailed below. On August 1, 2018, at approximately 10:30 a.m. central time, Reagor-Dykes filed bankruptcy. With the exception of FirstCapital, creditors received notice later the same day through local Lubbock news sources and word of mouth.

41.    On August 2, 2018, Vista received notice of FirstCapital's return and nonpayment of seventy-nine (79) Reagor-Dykes' items totaling $5,536,111.63, under the return reason of "uncollected funds hold." Prior to FirstCapital's return of these seventy-nine (79) items, FirstCapital had never returned a single Reagor-Dykes item to Vista for nonpayment.

42.    It is telling that FirstCapital submitted such a large volume of returns in its August 1, 2018 outgoing return cash letter for at least four reasons:

1) FirstCapital's August 1st cash letter included thirty-eight (38) returned items from Vista's July 27, 2018, outgoing cash letter, totaling $2,724,112.78 in returns. Having missed the July 31, 2018, return deadline for July 27, 2018, dated items, these thirty-eight (38) items were late under the Federal Reserve guidelines; requiring FirstCapital to engage in the labor-intensive investigation, processing and manual entry of all such "late" returns. To have processed and submitted all these late returns on August 1st indicates that FirstCapital began processing the return of these July 27th items well before Reagor-Dykes bankruptcy filing the mid-morning of August 1, 2018. FirstCapital's use of the manual return process alone is evidence of FirstCapital engaging in extraordinary efforts to hit Vista with return loses.

2) FirstCapital's processing and submitting the voluminous July 27th late returns on August 1st also indicates, upon information and belief, that FirstCapital initially approved these July 27th items for payment early on July 31st, but frantically reversed the course following FirstCapital's and the Burgess Brother Defendants' meeting with Dykes later on July 31st, trying and failing to timely return these items by the July 31, 2018 Federal Reserve cutoff.

3) The fact that of all of Reagor-Dykes banking institutions, including at least FirstCapital, IBC Bank of Oklahoma, AIM Bank and Vista, (i) only FirstCapital submitted an outgoing return cash letter on August 1st, the date Reagor-Dykes filed bankruptcy; and (ii) only FirstCapital attempted to charge back July 27, 2018, Reagor-Dykes items.

4) Dykes himself admitted to Vista's counsel that FirstCapital's team did in fact "work all night" on July 31st and early on August 1st to accelerate and process these voluminous returns to Vista.

43.     In summary, the evidence is clear that FirstCapital and the Burgess Brother Defendants (i) directly received material, non-public, inside information from Dykes, acting as both a Reagor-Dykes insider and a FirstCapital insider; (ii) intentionally and immediately acted on this information to damage Vista; and (iii) fraudulently presented items for payment as detailed in the next section.

### G.   The Defendants' Actions Intentionally Damaged Vista by at Least $6,000,000.00.

44.     FirstCapital's and the Burgess Brother Defendants' actions in conspiring with their friend and FirstCapital insider, Dykes, directly, knowingly and intentionally damaged Vista. As banking system professionals, the Defendants understood well the check clearing and chargeback process and how to exploit its timing to ensure FirstCapital continued to collect funds from fraudulent Reagor-Dykes deposits into its accounts while Vista absorbed the damages for the Reagor-Dykes bankruptcy and check kiting collapse. Defendant Kenneth Burgess, Jr. is also the Chairman of the American Bankers Association.  In that role, he is supposed to champion the rights of community banks nationwide.  However, he abused that trust by using his insider knowledge to harm other community banks, including Vista.  FirstCapital and the Burgess Brother Defendants weaponized the check clearance process and systematically foisted over $6,000,000.00 in damages onto Vista.

45.     First, by accelerating the mass return, including the manual late return, of millions of dollars in Reagor-Dykes items to Vista on July 31st and August 1st, FirstCapital and the Burgess Brother Defendants acted on Dykes' inside information to accelerate and exploit Vista's exposure to the Reagor-Dykes scheme, while intentionally depriving Vista of any opportunity to avoid accepting Reagor-Dykes deposits from FirstCapital, deposits FirstCapital knew it would never honor.

46.     Second, on information and belief, FirstCapital prematurely froze payments from Reagor-Dykes' FirstCapital bank accounts, before any bankruptcy filing, even when these accounts otherwise held available funds to pay items on Vista's July 27th and 30th outbound cash letters. Upon information and belief, at the same time FirstCapital initiated return of Reagor-Dykes' items to Vista, FirstCapital had approximately $8,500,000.00 in Reagor-Dykes funds from which to pay Vista on these items. Instead of paying Vista as it should have, and in furtherance of its scheme to harm Vista for its own benefit, FirstCapital froze all Reagor-Dykes funds and returned Reagor-Dykes' checks with the reason of "uncollected funds hold".

47.     FirstCapital's use of the uncollected funds hold reason, indicating a frozen account, as opposed to the "NSF" reason, indicating an unfrozen account that lacks sufficient funds, further supports the conclusion that FirstCapital intentionally froze Reagor-Dykes accounts to avoid paying Vista.

48.     On August 3, 2018, Vista received fifty (50) more items totaling $3,465,809.56, which were returned for non-payment from FirstCapital, drawn off accounts belonging to Reagor-Dykes entities. Of those items, forty-seven (47) items totaling $3,294,354.25 were returned under the reason "uncollected funds hold," and only three (3) items totaling $171,455.31 were returned for insufficient funds.

49.     In total, FirstCapital's and the Burgess Brother Defendants' actions damaged Vista by actively funneling $6,000,000.00 in Reagor-Dykes chargebacks and loses onto Vista, allowing FirstCapital and the Burgess Brother Defendants to improperly profit from its close relationship with Dykes, a large FirstCapital shareholder, Advisory Board Member and longtime former FirstCapital Director.

50.     In fact, FirstCapital now hides its close relationship and long history with Dykes, covering its tracks and disassociating itself from Dykes by deleting evidence of this relationship from its website. It appears FirstCapital has already received all it needs from Dykes.

51.     Vista files this lawsuit to recover over $6,000,000.00 in damages FirstCapital and the Burgess Brother Defendants inflicted on Vista through the Defendants' improper use of material, non-public, inside information to benefit from the Reagor-Dykes' check kiting scheme.

**V.**
**CLAIMS FOR RELIEF**

**Count 1 – Breach of Federal Reserve Regulation CC, 12 C.F.R. § 229**
**(FirstCapital)**

52.     Vista repeats and incorporates by reference the allegations set forth in the preceeding paragraphs.

53.     Federal Reserve Regulation CC, 12 C.F.R § 229.38(a) states:

(a) Standard of care; liability; measure of damages. A bank shall exercise ordinary care and act in good faith in complying with the requirements of this subpart. A bank that fails to exercise ordinary care or act in good faith under this subpart may be liable to the depositary bank, the depositary bank's customer, the owner of a check, or another party to the check. The measure of damages for failure to exercise ordinary care is the amount of the loss incurred, up to the amount of the check, reduced by the amount of the loss that party would have incurred even if the bank had exercised ordinary care. A bank that fails to act in good faith under this subpart may be liable for other damages, if any, suffered by the party as a proximate consequence….

54.     FirstCapital is a "Bank" as defined by Regulation CC, 12 C.F.R. § 229.2(e), imposing a legal duty on FirstCapital to exercise ordinary care and act in good faith in the check clearance, return and Federal Reserve letter process with Vista.

55.     FirstCapital failed to exercise ordinary care and failed to act in good faith with Vista by, among other acts, (i) improperly leveraging its Advisory Board member, former Director and major shareholder's role as an insider of Reagor-Dykes to obtain material, non-public, inside

knowledge of the Reagor-Dykes fraud, (ii) intentionally concealing its knowledge of the fraud to ensure the fraud continued and (iii) used this insider knowledge to benefit from the Reagor-Dykes fraud by returning and refusing to fund Reagor-Dykes checks held by Vista that FirstCapital otherwise should have funded, forcing Vista to incur the losses for these items.

56.     For these, and the other improper actions detailed in this Complaint, FirstCapital breached Federal Reserve Regulation CC, 12 C.F.R. § 229 in its dealings with Vista.

57.     FirstCapital's breaches damaged Vista in the amount of over $6,000,000.00, plus lost interest and attorneys' fees.

### Count 2 –Liability as Beneficiary of Reagor-Dykes' Fraud
### (First Capital and Burgess Brother Defendants)

58.     Vista repeats and incorporates by reference the allegations set forth in the preceeding paragraphs.

59.     In perpetrating its check kiting scheme, Reagor-Dykes committed fraud against Vista, by, among other actions:

a. Misrepresenting that the items Reagor-Dykes deposited with Vista were valid and payable by FirstCapital;

b. These misrepresentations were material;

c. Reagor-Dykes knew the items were not payable, and that these representations to Vista were false;

d. Reagor-Dykes made the representations to Vista to induce Vista to provide Reagor-Dykes access to funds through its Vista accounts;

e. Vista relied on Reagor-Dykes representations in providing access to funds on account of these items; and

f. Vista's reliance caused it damages of at least $6,000,000.00.

61.     Defendants had actual, advanced and insider knowledge of the Reagor-Dykes fraud, check kiting scheme, and related misrepresentations to Vista and used this knowledge to preserve the fraud long enough to enable FirstCapital and the Burgess Brother Defendants to pass FirstCapital's risk onto Vista, allowing FirstCapital to retain and collect funds that otherwise it would have lost and to avoid paying funds to Vista it otherwise should have paid. Put simply, FirstCapital knowingly hid behind the Reagor-Dykes fraud while fraud related funds flowed to FirstCapital, and FirstCapital pushed loses to Vista through FirstCapital's mass return of Reagor-Dykes checks.

62.     Due to FirstCapital's and the Burgess Brothers' scheme to benefit from the Reagor-Dykes fraud, Vista has been damaged in the amount of over $6,000,000.00.

### Count 3 – Fraud by Nondisclosure
### (First Capital and Burgess Brother Defendants)

63.     Vista repeats and incorporates by reference the allegations set forth in the preceeding paragraphs.

64.     FirstCapital owed Vista a legal duty of ordinary care and good faith under Regulation CC, 12 C.F.R § 229.38(a) to accurately represent Reagor-Dykes' ability to pay the checks presented, and a duty of candor in refraining from knowingly advancing unlawful business practices directed at Vista.

65.     Acting in bad faith, FirstCapital concealed from or failed to disclose these facts to Vista, despite knowing that Vista was ignorant of the facts, and not having an equal opportunity to discover the false information.

66.     Further, Defendants intentionally caused the Reagor-Dykes' FirstCapital accounts to be frozen while allowing Vista to continue to accept deposit of checks drawn on these accounts, and Vista relied on FirstCapital's nondisclosure.

67.     Due to FirstCapital's and the Burgess Brothers' nondisclosure of the known check kiting scheme, Vista has been damaged in an amount to be determined by the trier of fact.

## Count 4 – Negligence
### (FirstCapital)

67.     Vista repeats and incorporates by reference the allegations set forth in the preceeding paragraphs.

68.     FirstCapital owed a legal duty to timely pay items held by Vista and to otherwise comply with the cash letter, check payment and clearance process in good faith. Further, FirstCapital owed Vista a legal duty of ordinary care and good faith under Regulation CC, 12 C.F.R § 229.38(a).

69.     FirstCapital breached these duties, by, among other bad acts, negligently and prematurely freezing Reagor-Dykes accounts, taking advantage of insider information to game the check payment and return system and intentionally diverting losses to Vista.

70.      FirstCapital's actions that benefitted from the Reagor-Dykes fraud damaged Vista in an amount to be determined by the trier of fact.

## Count 5 – Gross Negligence
### (FirstCapital)

71.     Vista repeats and incorporates by reference the allegations set forth in the preceeding paragraphs.

72.     FirstCapital engaged in its negligent activities with knowledge and a conscious indifference to the extreme degree of risk of harm that Vista would inevitably incur. Further, FirstCapital owed Vista a legal duty of ordinary care and good faith under Regulation CC, 12 C.F.R § 229.38(a).

73.     Due to FirstCapital's gross negligence, Vista has been damaged in an amount to be determined by the trier of fact, which is to include an amount associated with punitive damages.

## Count 6 – Money Had and Received
### (FirstCapital)

74.     Vista repeats and incorporates by reference the allegations set forth in the preceeding paragraphs.

75.     FirstCapital collected and withheld monies payable to Vista.

76.     FirstCapital knowingly facilitated and supported the continuation of Reagor-Dykes' check kiting scheme to enable FirstCapital to continue to collect fraud-related funds and deposits, while actively pushing fraud losses on to Vista through a system of mass returns, causing Vista to suffer over $6,000,000.00, in damages. This money in equity and good conscience belongs to Vista, and FirstCapital has refused to return this money.

77.     As a result, FirstCapital should be required to pay to Vista this wrongfully withheld money.

## Count 7 – Conversion
### (FirstCapital)

78.      Vista repeats and incorporates by reference the allegations set forth in the preceeding paragraphs.

79.     Vista had the legal right to possess the funds held by FirstCapital from various items and cash letters drawn from FirstCapital accounts.

80.     FirstCapital wrongfully exercised dominion over these funds.

81.     Due to FirstCapital's wrongful dominion over these funds, Vista has been damaged in an amount to be determined by the trier of fact.

## Count 8 – Unjust Enrichment
### (FirstCapital)

82.     Vista repeats and incorporates by reference the allegations set forth in the preceeding paragraphs.

83.     FirstCapital unjustly enriched itself at Vista's expense because of fraud and undue advantage. Therefore, Vista asserts a claim against this money, which in equity and good conscience, belongs to Vista.

### Attorneys' Fees
### (FirstCapital and Burgess Brothers)

84.     Vista repeats and incorporates by reference the allegations set forth in the preceeding paragraphs.

85.     The law requires Vista to engage counsel to represent it in the prosecution of these claims. Vista has agreed to pay its attorneys a reasonable fee for their services and is entitled to recover such fees from Defendants pursuant to Federal Reserve Regulation CC, 12 C.F.R. § 229.34(h), as well as any other state or federal statute providing for the payment of attorneys' fees to the prevailing party on claims pleaded by Vista herein.

### VI.
### JURY DEMAND

86.     Plaintiff requests that a jury be convened to try the factual issues in this case.

### VII.
### REQUEST FOR RELIEF

WHEREFORE, premises considered, Vista respectfully requests that the Court set this case for trial, and that the Court grant Vista the following relief against Defendants, as follows:

a)      Compensatory damages to be proven at trial on all issues available;

b)      Disgorgement of ill-gotten gain that Defendants received in its unlawful activity;

c)      Punitive damages to be proven at trial on all issues available based on Defendants' wrongful conduct, in an amount no less than $12,000,000, pursuant to TEX. CIV. PRAC. & REM. CODE §41.008;

d)      Vista's consequential damages based on Defendants' wrongful conduct;

e)      Pre-Judgment and Post-judgment interest at the maximum rate allowed by law;

f)      All costs and expenses of litigation, including all attorneys' fees incurred in bringing this action; and

g)      Such other and further relief as the Court deems just and proper.


Respectfully submitted,


By:/s/ Fernando M. Bustos
Fernando M. Bustos
State Bar No. 24001819
fbustos@bustoslawfirm.com
Matthew N. Zimmerman
State Bar No. 24100386
mzimmerman@bustoslawfirm.com
Deirdre Kelly Trotter
State Bar No. 45006069
dtrotter@bustoslawfirm.com
BUSTOS LAW FIRM, P.C.
P.O. Box 1980
Lubbock, Texas 79408-1980
Phone: (806) 780-3976
Facsimile: (806) 780-3800

ATTORNEYS FOR VISTA BANK