THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| VISTA BANK, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Case No. 5:18-cv-00204-C |
| | § | |
| FIRST BANCSHARES OF TEXAS, INC., | § | |
| a Texas financial institution doing business | § | |
| as FIRSTCAPITAL BANK OF TEXAS, | § | |
| N.A., BRAD BURGESS, and KENNETH | § | |
| L. BURGESS, JR., | § | |
| | § | |
| Defendants. | § | |

## DEFENDANTS FIRST BANCSHARES OF TEXAS, INC. AND FIRSTCAPITAL BANK OF TEXAS, N.A.'S BRIEF IN SUPPORT OF MOTION TO DISMISS

SPROUSE SHRADER SMITH PLLC
Joel R. Hogue, State Bar No. 09809720
joel.hogue@sprouselaw.com
John Massouh, State Bar No. 24026866
john.massouh@sprouselaw.com
M. Chase Hales, State Bar No. 24083124
chase.hales@sprouselaw.com
701 S. Taylor, Suite 500 (79101)
P.O. Box 15008
Amarillo, Texas   79105
(806) 468-3300; (806) 373-3454 fax

**ATTORNEYS FOR DEFENDANT, FIRST
BANCSHARES OF TEXAS, INC., DBA
FIRSTCAPITAL BANK OF TEXAS, N.A.**

i

## TABLE OF CONTENTS

INDEX OF AUTHORITIES ................................................................................................ iii

I.     INTRODUCTION ............................................................................................... 1

II.    ARGUMENT AND AUTHORITIES ................................................................... 5

   A.   Motion to Dismiss Standard ................................................................................. 5

   B.   The Law Regarding the Allocation of Losses Upon the Collapse of a Check Kite ........... 6

      1.   What is a Check Kite? .................................................................................. 7

      2.   How Should a Bank Respond to a Check Kite? ........................................... 8

      3.   What Law Applies to the Allocation of Losses Caused by a Check Kite? ................. 9

         a.   UCC Duties .......................................................................................... 10

         b.   Regulation CC Duties .......................................................................... 11

   C.   Vista Bank's Claims Don't Measure Up Under the Law. ................................. 14

   D.   Courts Dismiss *All* Claims and Defenses that Don't Satisfy the UCC or Subpart C ........ 15

   E.   Vista Bank Seeks to Recover Damages for Checks FirstCapital Timely Dishonored. .... 20

   F.   No Basis Exists for Vista Bank to Recover Punitive Damages or Attorney's Fees. ........ 21

III.   CONCLUSION .................................................................................................. 21

CERTIFICATE OF SERVICE ......................................................................................... 23

# INDEX OF AUTHORITIES

## Cases

*½ Price Checks Cashed v. United Auto Ins. Co.*,
  344 S.W. 378 (Tex. 2011) .......................................................................................... 9

*Alta Vista State Bank v. Kobliska*,
  897 F.2d 930 (8th Cir. 1990) ................................................................................... 15

*American Airlines Employees Fed. Credit Union v. Martin*,
  29 S.W.3d 86 (Tex. 2000) .......................................................................................... 9

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................... 5, 6

*Bank One Chicago., N.A. v. Midwest Bank & Trust Co.*,
  516 U.S. 264 (1996) ................................................................................................. 12

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................... 5

*Campbell v. City of San Antonio*,
  43 F.3d 973 (5th Cir. 1995) ....................................................................................... 5

*Citizens National Bank v. First National Bank*,
  347 So.2d 964 (Miss. 1977) ..................................................................... 8, 15, 18, 19

*Conley v. Gibson*,
  355 U.S. 41 (1974) ..................................................................................................... 5

*Cumis Ins. Soc'y, Inc. v. Windsor Bank & Tr. Co.*,
  736 F. Supp. 1226 (D. Conn. 1990) ......................................................................... 15

*Cuvillier v. Taylor*,
  503 F.3d 397  (5th Cir. 2007) .................................................................................... 6

*Ennis State Bank v. Heritage Bank*,
  No. 10-02-226-CV, 2004 Tex. App. LEXIS 4355, at *2 (Tex. App. - - Waco, May 12, 2004,
  pet. denied) ...................................................................................................... passim

*First Financial Bank, N.A. v. Citibank, N.A.*,
  No. 1:11-CV-226, 2012 U.S. Dist. LEXIS 104883, at *25-26 (S.D. Ind., July 27, 2012) .. 3, 13

*First National Bank v. Colonial Bank*,
  898 F. Supp. 1220 (N.D. Ill. 1995) ........................................................... 7, 11, 15, 19

*Frost Nat'l Bank v. Midwest Autohaus*,
  241 F.3d 862 (7th Cir. 2001) ................................................................................... 15

*Glotfelty v. Karas*,
  No. 12-30532, 2013 WL 600253 (5th Cir. Feb. 15, 2013) ...................................... 6

*Gooley v. Mobile Oil Corp.*,
  851 F.2d 513 (1st Cir. 1988) ...................................................................................... 5

*Guerra v. Regions Bank*,
  188 S.W.3d 744 (Tex. App.–Tyler 2006, no pet.) .................................................... 15

*Kjellvander v. Citicorp.*,
  156 F.R.D. 138 (S.D. Tex. 1994) ............................................................................... 5

*Midwestern Cattle Mktg. v. Legend Bank, N.A.*,
  No. 4:17-CV-375-A, 2018 U.S. Dist. LEXIS 82291, at *7-9 (Tex. App. - - Ft. Worth, May 16,
  2018, appeal pending) ................................................................................... 10, 15, 16

*Owens v. Comerica Bank*,
    229 S.W.3d 544 (Tex. App.–Dallas 2007, no pet.)................................................. 15
*Reyes v. North Texas Tollway Auth.*,
    830 F.Supp.2d 194 (N.D. Tex. 2011) .................................................................... 6
*Rhodes v. Prince*,
    360 Fed.Appx. 555 (5th Cir. 2010)....................................................................... 5
*Ritchie v. Rupe*,
    433 S.W.3d 856 (Tex. 2014)................................................................................. 9
*Southwest Bank v. Information Support Concepts, Inc.,*
    149 S.W.3d 104 (Tex. 2004)................................................................................. 9
*State Farm Bank, F.S.B. v. Manheim Auto Financial Services,*
    No. 3:10-CV-519-L, 2010 U.S. Dist. LEXIS 80698, at *8-9 (N.D. Tex., August 6, 2010) ..... 15
*Wells Fargo Bank, N.A. v. Citizens Bank of Tex. N.A.*,
    181 S.W.3d 790 (Tex. App.–Waco 2005, pet denied)....................................... 16, 17

## Statutes

Fed. R. Civ. P. 12................................................................................................. 5
Fed. R. Civ. P. 8................................................................................................... 5
Fed. R. Civ. P. 9................................................................................................... 6

## Other Authorities

12 C.F.R. §229......................................................................................... passim
12 U.S.C. §4001.................................................................................... 10, 11
Tex. Bus. & Comm. Code, §1.304......................................................................... 10
Tex. Bus. & Comm. Code, §4.104......................................................................... 10
Tex. Bus. & Comm. Code, §4.105................................................................... 10, 11
Tex. Bus. & Comm. Code, §4.302................................................................... 11
Thomas E. McCurnin and Peter A. Frandsen, *Grounding Check Kiting with Check 21:  The Civil
    and Criminal Ramifications of Check Kiting in the 21st Centur*y,
    The Banking Law Journal, 295, 296, 298-299, 306,  307, 310 (2008)............................ 7, 8

The Defendants, First BancShares of Texas, Inc. and FirstCapital Bank of Texas, N.A., file this Brief in Support of Motion to Dismiss.

## I.      INTRODUCTION

1.      The question to be answered in this case is whether FirstCapital Bank of Texas, N.A. ("FirstCapital") properly returned and dishonored over $6,000,000 of checks Plaintiff VistaBank presented for payment that were drawn on "Reagor-Dykes"[1] accounts at FirstCapital. The answer is that the officers, directors, and employees of FirstCapital acted prudently and exactly as their fiduciary responsibilities to the shareholders, depositors and customers of FirstCapital compelled them to do. They timely and properly dishonored and returned the Reagor-Dykes checks to Vista Bank precisely as the applicable banking laws permitted.

2.      This lawsuit arises out of well-publicized bankruptcy filings by several of the Reagor-Dykes entities.[2]   It now appears that hundreds of creditors, including banks like FirstCapital and Vista Bank, will be left "holding the bag" for unpaid Reagor-Dykes checks and bills, some of it arising as a result of a check kiting scheme perpetrated by Reagor-Dykes.  So, Vista Bank is not alone in being victimized by Reagor-Dykes.

3.      Vista Bank brings eight claims against FirstCapital.  Seven of the eight claims are common law tort and contract-based claims.  These common law claims have no application to this case as the field of law relating to the clearing of checks has been pre-empted by the Uniform Commercial Code ("UCC") and federal regulations.

---

[1] Vista Bank lumps seven separate legal entities "and other related and affiliated entities as "Reagor-Dykes." Original Complaint, at Preliminary Statement.  Otherwise, Vista Bank does not distinguish among them despite being separate legal entities.

[2] The following Reagor-Dykes bankruptcies were filed in the United States Bankruptcy Court for the Northern District of Texas on the morning of August 1, 2018:  *In re Reagor-Dykes Motors, LP*, No. 18-50214, *In re Reagor-Dykes Imports, LP*, No. 18-50215, *In re Reagor-Dykes Amarillo, LP*, No. 18-80216, *In re Reagor-Dykes Auto Company, LP,* No. 18-50217, In re Reagor-Dykes Plainview, LP, No. 18-50218, *In re Reagor-Dykes, LP*, No. 18-50219.

4.      The only claim asserted by Vista Bank that relates directly to the check clearing process is one tied to a federal regulation requiring that a "bank shall exercise ordinary care and act in good faith in complying with the requirements *of this subpart*."  (emphasis added).  Vista Bank also tries to tie this ordinary care/good faith standard into three of its common law claims.

5.      But courts that have considered arguments like this, no matter how the claims are couched, hold that this regulation, standing alone, does not create a duty to which the obligations of ordinary care and good faith attach.   In other words, there must be an independently-recognized duty *in the federal regulation* (i.e., the subpart) before there is an obligation to exercise ordinary care and good faith under that regulation.   There are no specified duties recognized under the federal regulation that come into play under the facts of this case.  The only recognized duty in this case is one of strict liability owed by FirstCapital under the UCC to either pay or dishonor checks by midnight on the day after Vista Bank presented the Reagor-Dykes checks to FirstCapital for payment. Vista Bank asserts no claim under the UCC.

6.      In this case, Vista Bank alleges, and FirstCapital does not deny, that FirstCapital *missed* the deadline for checks totaling $2,724,112.78 presented to First Capital for payment on July 30th and for which the midnight deadline was July 31st.[3]   There is a process through the Federal Reserve system for Vista Bank to reverse the credits FirstCapital received for those checks.[4]  Vista Bank recognizes this as it does not seek to recover damages in this case for those checks.   Thus, notwithstanding all of the sound and fury in Vista Bank's Original Complaint about FirstCapital receiving "non-public insider information" and working greedily through the

---

[3] Original Complaint, ¶42(1).  Vista Bank avoids saying that these checks were presented to First Capital for payment on July 30th.  Instead, Vista Bank focuses on its outgoing cash letter to FirstCapital on Friday, July 27th to make it appear that FirstCapital was working on returning these checks as early as July 27th.  This is a false impression and, as discussed later in this brief, it is belied by the fact that the midnight deadline for checks first presented to FirstCapital for payment on July 30th was July 31st.
[4] There are limited circumstances where the midnight deadline can be extended, but these issues are not before the Court.  12 C.F.R. §229.30(c).

night on July 31st, it is all irrelevant.  This is because FirstCapital could not meet the midnight deadline on July 31st anyway, and Vista Bank recognizes that it can seek recovery for those checks through the Federal Reserve.

7.      Instead, what this case is about are Reagor-Dykes checks presented by Vista Bank to FirstCapital on July 31st and August 1st totaling $6,277,808.41, for which First Capital *met* the return midnight deadlines on August 1st and August 2nd, respectively, and for which Vista Bank received timely notice of dishonor on August 2nd and 3rd, respectively.[5]  These are the damages Vista Bank seeks to recover through this lawsuit as it seeks to recover over $6,000,000 from FirstCapital.[6]  As a matter of law under the Uniform Commercial Code and related federal regulations, FirstCapital satisfied its duty, as well as any obligations of ordinary care and good faith that go along with that duty, so that there is no legal basis for the $6,000,000 in claims asserted here.

8.      Rather than recognize the applicable body of law that applies to this situation, Vista Bank chooses instead to distort the facts and use language like "non-public insider information" and other sinister-sounding words to try to make its case based on alleged misconduct of FirstCapital occurring in excess of 24 hours before the first midnight deadline on August 1st.  Allegations such as these led one court to label the bank's argument as "specious" where the case was so clearly determined under the UCC and regulatory framework.[7]  Vista Bank has not, will not, and cannot cite to any law that says FirstCapital could not move to protect its own interest once it learned on July 31st from Rick Dykes or otherwise "of Ford's impending

---

[5] *See infra,* ¶61.
[6] Original Complaint, ¶¶20, 35, 44, 51, 59, 62, 76.  In fact, if any part of this case survives this motion to dismiss, the evidence will show that Reagor-Dykes was contractually obligated to disclose adverse conditions such as threatened lawsuits or any other material change to Reagor-Dykes' financial condition, just as Rick Dykes did.
[7] *First Financial Bank, N.A. v. Citibank, N.A.*, No. 1:11-CV-226, 2012 U.S. Dist. LEXIS 104883, at *25-26 (S.D. Ind., July 27, 2012).

legal action, Reagor-Dykes' severe financial problems, and Reagor-Dykes' planned bankruptcy filing" as alleged by Vista Bank.[8]

9.      A host of cases and other authorities cited in this brief emphasize the need for quick action under circumstances like these and the cases and authorities recognize that closing accounts and returning checks are the prudent things for banks to do to protect their own interests, even if it means competing banks will suffer losses.

10.     The ensuing collapse of the Reagor-Dykes check kite will cause losses to both Vista Bank and FirstCapital.  Regarding a collapsed check kite and the need for quick action, one court said it this way, "As in the game of musical chairs, [the last bank] was left without a chair."[9]  For those checks totaling $2,724,112.78 for which FirstCapital *missed* the midnight deadline, it will be left without a chair.  For those checks for which FirstCapital *met* the midnight deadline totaling $6,277,808.41, Vista Bank will be left without a chair.  This case is that simple.

11.     The only claims Vista Bank asserts in this lawsuit are for dishonored Reagor-Dykes checks for which FirstCapital *met* the midnight deadline.  Consequently, all of Vista Bank's claims totaling "over $6,000,000" should be dismissed for failure to state a claim, as should its claims for punitive damages and attorney's fees.

12.     Finally, Vista Bank has sued the wrong entity.  First Bancshares of Texas, Inc. is a holding company for FirstCapital Bank of Texas, N.A., a national banking association chartered by the Office of the Comptroller of the Currency.[10]  FirstCapital Bank of Texas, N.A. is not merely a name under which First Bancshares of Texas, Inc. does business as alleged by Vista Bank.

---

[8] Original Complaint, ¶32.
[9] *Ennis State Bank v. Heritage Bank*, No. 10-02-226-CV, 2004 Tex. App. LEXIS 4355, at *2 (Tex. App. - - Waco, May 12, 2004, pet. denied).
[10] *See* Certificate of Interested Persons filed contemporaneously.

## II.        ARGUMENT AND AUTHORITIES

### A.        Motion to Dismiss Standard

13.        Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted."[11]   Under Ru1e 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."[12]   In order to survive a motion to dismiss under Federal Rule of Procedure 12(b)(6), a plaintiff must demonstrate that the complaint provides fair notice of plaintiff's claims.[13]   The facts alleged must sufficiently show a plausible claim for relief.[14]

14.        Although "the pleading standard Rule 8 announces does not require 'detailed factual allegations,'" "it demands more than 'labels and conclusions.'"[15]   "'[A] formulaic recitation of the elements of a cause of action will not do.'"[16]   "The complaint must contain either direct allegations on every material point necessary to sustain a recovery . . . or contain allegations from which an inference fairly may be drawn under the relevant legal theory."[17] However, "[t]he court is not required to conjure up unpled allegations or construe elaborately arcane scripts to save [the] complaint."[18]

15.        While courts are required to take all factual allegations found in a complaint as true for purposes of a motion to dismiss, a court is "not bound to accept as true a legal conclusion couched as a factual allegation."   [19]   Where well-pleaded facts "do not permit the court to infer

---

[11] FED. R. CIV. P. 12(b)(6).
[12] FED. R. CIV. P. 8(a)(2).
[13] *Conley v. Gibson*, 355 U.S. 41, 47 (1974).
[14] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 569 (2007).
[15] *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555.).
[16] *Id*.
[17] *Campbell v. City of San Antonio*, 43 F.3d 973, 975 (5th Cir. 1995) (quoting 3 C. Wright & A. Miller, Fed. Prac. & Proc.: Civil 2d § 1216 at 156-59).
[18] *Id*.   (quoting *Gooley v. Mobile Oil Corp.*, 851 F.2d 513, 514 (1st Cir. 1988); *see also, Kjellvander v. Citicorp.*, 156 F.R.D. 138, 141 (S.D. Tex. 1994).
[19] *Iqbal*, 566 U.S. at 678-79 (noting that Rule 8 "does not unlock the doors for discovery for a plaintiff armed with nothing more than conclusions"). *See also Rhodes v. Prince*, 360 Fed.Appx. 555, 558 (5th Cir. 2010) (noting that

more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief."[20]

16.     Accordingly, a court considering a motion to dismiss pursuant to 12(b)(6) must take a two pronged approach in making its determination on the motion.[21]   First, the court must determine which facts in the complaint deserve the assumption of truth by identifying the non-conclusory factual allegations in the complaint.[22]   Next, drawing all inferences in favor of the plaintiff, the court must decide whether the non-conclusory allegations plausibly give rise to an entitlement of relief.[23]

17.     "'[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'"[24]

18.     Further, fraud-based claims require the party to "state with particularity the circumstances constituting fraud."[25]

**B.      The Law Regarding the Allocation of Losses Upon the Collapse of a Check Kite.**

19.     Unfortunately, check kiting occurs with some degree of regularity when a failing business becomes desperate and begins kiting checks to keep the business artificially alive while searching for a solution to the business's underlying financial problems.   Check kiting has been

---

"legal conclusions must be supported by factual allegations" in order to be entitled to the assumption of truth by the court); *see also, Glotfelty v. Karas*, No. 12-30532, 2013 WL 600253 (5th Cir. Feb. 15, 2013) (noting that facts alleged by the plaintiff that lacked factual support for claims were insufficient to state a claim for relief).

[20] *Reyes v. North Texas Tollway Auth.*, 830 F.Supp.2d 194, 203 (N.D. Tex. 2011) (stating "the plaintiff must plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

[21] *See Iqbal*, 566 U.S. at 679.

[22] *Id.*

[23] *Id.  See also, Reyes*, 830 F.Supp.2d at 203.

[24] *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Twombly*, 550 U.S. at 558).

[25] Fed. R. Civ. P. 9 (b).

around since at least the late 1700s.[26] The allocation of losses suffered by banks that find themselves victimized by a mutual customer's check kiting scheme is governed the UCC and related federal regulations. To understand the situation, some background information is helpful.

### 1. What is a Check Kite?

20. So what is a check kite and what causes it to collapse? One court offered the following primer:

> Check kiting is possible because of a combination of two rules found in Article 4 of the Uniform Commercial Code. Under §4.208(1), a depositary bank may allow a customer to draw on uncollected funds, that is, checks that have been deposited but not yet paid. Second, under §§4-301 and 4-302, a payor bank must either pay or dishonor a check drawn on it by midnight of the second banking day following presentment. Thus when a kite is operating, the depositary bank allows the kiter to draw on uncollected funds based on a deposit of a check. The depositary bank presents that check to the payor bank, which must decide whether to pay or return the check before the midnight deadline. The check may appear to be covered by uncollected funds at the payor bank, and so the payor bank may decide to pay the check by allowing the midnight deadline to pass.

> A kite crashes when one of the banks dishonors checks drawn on it and returns them to the other banks involved in the kite. Usually, such a dishonor occurs when one bank suspects a kite. However, an individual bank may have trouble detecting a check kiting scheme. Until one has devoted a substantial amount of time examining not only one's own account, but accounts at other banks, it may be impossible to know whether the customer is engaged in a legitimate movement of funds or illegitimate kiting. But each bank is usually able to monitor only its own account, and there is no certain test that distinguishes one who writes many checks on low balances from a check kiter. [27]

21. Vista Bank's practice of allowing Reagor-Dykes to access uncollected funds - - that is, giving Reagor-Dykes immediate access to funds before its deposited checks had been

---

[26] Thomas E. McCurnin and Peter A. Frandsen, *Grounding Check Kiting with Check 21: The Civil and Criminal Ramifications of Check Kiting in the 21st Century*, THE BANKING LAW JOURNAL, 295, 296 (2008). A copy of this journal article is contained in the separately-filed Appendix at Exhibit A, beginning at 001.
[27] *First National Bank v. Colonial Bank*, 898 F. Supp. 1220, 1222-23 (N.D. Ill. 1995) (citations omitted).

collected - - is what exposed Vista Bank to the risk of Reagor-Dykes' check kite.  "Without uncollected funds, there can be no check kite."[28]

22.     Banks can protect themselves from check kites in a number of ways.  The bank can require the customer to pledge collateral to secure uncollected funds, or the bank can simply place a hold on uncollected funds until the funds are collected.[29]   In the end, it is a question about how much trust a bank is willing to place in its customer.  In this case, Vista Bank chose to trust Reagor-Dykes.

23.     Should a bank that discovers a kite contact other banks?  As one commentator says, "Contacting the other banks where the kiter was using can be touchy because of privacy and inter-bank liability issues.  Improper disclosure of customer information to another bank investigator could impose liability to the bank . . ."[30]

### 2.     How Should a Bank Respond to a Check Kite?

24.     One thing is certain.  When a check kite is suspected, quick decisions and actions must be taken.  There is not a lot of time for quiet contemplation.  As one bank commentator said, "A drawee bank which discovers a kite must immediately start returning checks to the collecting bank.  There simply is no time to lose and delay may mean losing the right to return the checks to the collecting bank."[31]   Further, the commentator said, "After the kite has been discovered, the first thing the bank must do is freeze the account and return all checks drawn on the account . . . If the bank fails to immediately freeze the account and tries to maneuver the loss

---

[28] McCurnin and Frandsen, Grounding Check Kiting with Check 21:  The Civil and Criminal Ramifications of Check Kiting in the 21st Century, THE BANKING LAW JOURNAL, at 298-299 (Appendix at Exhibit A, at 005).

[29] 12 C.F.R. §229.13. *See also, Citizens National Bank v. First National Bank*, 347 So.2d 964, 967 (Miss. 1977) (depository bank had the right to refuse to credit customer's account until checks cleared).

[30] McCurnin and Frandsen, Grounding Check Kiting with Check 21:  The Civil and Criminal Ramifications of Check Kiting in the 21st Century, THE BANKING LAW JOURNAL, at 310 (Appendix at Exhibit A, at 016).

[31] McCurnin and Frandsen, Grounding Check Kiting with Check 21:  The Civil and Criminal Ramifications of Check Kiting in the 21st Century, THE BANKING LAW JOURNAL, at 306 (Appendix at Exhibit A, at 012).

by keeping the kite open, it may ultimately lose the entire overdraft and be responsible for another bank's loss as well."[32]

25.       Indeed, to not act quickly would be a potential breach of fiduciary duties owed by FirstCapital officers to the institution they serve: FirstCapital.[33]  Conversely, FirstCapital officers owe no fiduciary duties to a competing bank such as Vista Bank.[34]  Of course, FirstCapital must follow the rules for returning and dishonoring checks as established by the UCC and federal regulations.  That is exactly what FirstCapital did.

### 3.       What Law Applies to the Allocation of Losses Caused by a Check Kite?

26.       The allocation of losses arising from a check kite are governed by the UCC, as adopted by the state of Texas, and related federal regulations.

27.       The UCC is a codification of rules "carefully integrated and intended as a uniform codification of permanent character covering an entire 'field' of law."[35]  "The UCC contains a comprehensive and carefully considered allocation of responsibility in banking relationships."[36] Article 3 of the UCC "establishes a comprehensive scheme governing the procedures, liabilities, and remedies pertaining to negotiable instruments, including checks."[37] Article 4 of the UCC "establishes the rights and duties between banks and their customers regarding deposits and collections."[38]

---

[32] *Id*. at 307.
[33] *Ritchie v. Rupe*, 433 S.W.3d 856, 868-69 (Tex. 2014) (corporate officers and directors owe the corporation fiduciary duties of obedience, loyalty, and due care).
[34] *See infra,* ¶¶ 47 through 60.
[35] *Southwest Bank v. Information Support Concepts, Inc.,* 149 S.W.3d 104, 109 (Tex. 2004) (quoting Texas Business & Commerce Code, §1.104, comment 1).
[36] *Id.* at 107.
[37] *½ Price Checks Cashed v. United Auto Ins. Co.*, 344 S.W. 378, 380 (Tex. 2011).
[38] *American Airlines Employees Fed. Credit Union v. Martin*, 29 S.W.3d 86, 91 (Tex. 2000).

28.     The check clearing process is also affected by Regulation CC of the Board of Governors Federal Reserve System[39] promulgated under the authority granted by Congress under the Expedited Funds Availability Act.[40]

29.     In short, the UCC, as supplemented by Regulation CC, provide a comprehensive scheme for the check handling process that provides the sole basis for any duties among the banks involved in the check clearing process.

30.     The UCC provides that, "Every contract or duty within this title imposes an obligation of good faith in its performance or enforcement."[41]  And, as Vista Bank points out, under Regulation CC, "A bank shall exercise ordinary care and act in good faith in complying with the requirements *of this subpart*."[42]

31.     But the obligations to exercise ordinary care and act in good faith do not exist independent of a duty.[43]  So what are the duties the UCC and Regulation CC impose on banks relative to one another in the check clearing process arising in the midst of dire financial circumstances for a mutual customer engaged in a check kiting scheme?

    a.     **UCC Duties**

32.     Under Article 4, a "payor bank" is defined as the "drawee of a draft"[44] and "drawee" is defined as "a person ordered in a draft to make payment."[45]   FirstCapital is the payor bank in this case.

---

[39] 12 C.F.R. §229

[40] 12 U.S.C. §4001, *et seq.*

[41] Tex. Bus. & Comm. Code, §1.304.

[42] 12 C.F.R. §229.38(a) (emphasis added).

[43] *See generally, Midwestern Cattle Mktg. v. Legend Bank, N.A.,* No. 4:17-CV-375-A, 2018 U.S. Dist. LEXIS 82291, at *7-9 (Tex. App. - - Ft. Worth, May 16, 2018, appeal pending); *Wells Fargo Bank, N.A. v. Citizens Bank of Texas, N.A.* 181 S.W.3d 790, 804 (Tex. App. - - Waco 2005, pet.denied); *Ennis State Bank v. Heritage Bank*, No. 10-02-226-CV, Tex. App. LEXIS 4355, at *2-5 (Tex. App. - - Waco, May 12, 2004,  pet. denied).

[44] Tex. Bus. & Comm. Code, §4.105(3).

[45] Tex. Bus. & Comm. Code, §4.104(a)(8).

33.     Under Article 4, a "depository bank" is the "first bank to take an item."[46] Vista Bank is the depository bank in this case.

34.     As payor bank, FirstCapital is required to pay or dishonor by its midnight deadline.[47] "Midnight deadline" is defined "with respect to a bank [as] midnight on its next banking day following the banking day on which it receives the relevant item or notice or from which time for taking action commences to run, whichever is later." In this case, checks presented for payment to the payor bank on day 1 are required to be paid or dishonored by midnight of day 2.

35.     A payor bank, like First Capital, is "*accountable* for the amount of the check presented to it for payment if it does not pay or return the item or send notice of dishonor until after its midnight deadline."[48] The duty imposed on FirstCapital by this UCC provision is one of strict liability,[49] so any obligation of ordinary care or good faith is irrelevant. Either FirstCapital met the deadline under the UCC, or it didn't.

### b.     Regulation CC Duties

36.     Layered on top of the UCC framework is the federal Expedited Funds Availability Act[50] and Regulation CC[51] promulgated pursuant to that act. As Vista Bank points out, Regulation CC[52] sets forth the standard of care for complying with the requirements of Subpart

---

[46] Tex. Bus. & Comm. Code, §4.105(2).
[47] Tex. Bus. & Comm. Code, §4.302(a)(1).
[48] Tex. Bus. & Comm. Code, §4.302(a)(1) (emphasis added).
[49] *Ennis State Bank v. Heritage Bank*, No. 10-02-226-CV, Tex. App. LEXIS 4355, at *6-7 (Tex. App. - - Waco, May 12, 2004, pet. denied) ("Accountable means that the payor bank is strictly liable for the amount of the check.") (emphasis added). *See also, First National Bank v. Colonial Bank*, 898 F. Supp. 1220, 1226 (N.D. Ill. 1995) ("The operative word in this section is 'accountable.' Courts interpreting this section have nearly unanimously concluded that §4.302 imposes strict liability on a payor bank for failing to adhere to the midnight deadline, and make the measure of damages the face amount of the check.").
[50] 12 U.S.C. §4001, *et seq.*
[51] 12 C.F.R., Part 229, Subpart C.
[52] 12 C.F.R. §229.38(a).

C. Specifically, "A bank shall exercise ordinary care and act in good faith in complying with the requirements of this subpart."[53]

37.    Regulation CC contains rules to expedite the collection and return of checks by banks.[54]   Regulation CC is further broken down into Subpart C[55] and it covers the direct return of checks, the manner in which the paying bank (FirstCapital) must return checks to the depository bank (Vista Bank), notification of nonpayment by the paying bank, indorsement and presentment of checks, same-day settlement for certain checks, the liability of banks for failure to comply with Subpart C, and other matters.[56]

38.    In the context of this case, the only provision of Subpart C that bears on any duties of FirstCapital as the payor bank is Section 229.31 (Paying bank's responsibility for return of checks and notices of nonpayment).   Most notably, it provides that a payor bank (First Capital) shall return checks in an expeditious manner such that the check would normally be received by the depository bank (Vista Bank) not later than 2 p.m.   This obligation can be satisfied if the payor bank meets its midnight deadline the day before.   But if the payor bank misses the midnight deadline, there may be relief if the bank acts expeditiously to return the checks to the depository bank before 2 p.m. on the next day.   In this context, the duties of ordinary care and good faith might come into play in determining whether the bank acted expeditiously.

39.    Contrary to Vista Bank's belief, Section 229.38(a) does not impose a global standard of care for any action taken by a bank that ultimately affects the collection and return of

---

[53] 12 C.F.R. §229.38(a).  *See also*, *Bank One Chicago., N.A. v. Midwest Bank & Trust Co.*, 516 U.S. 264, 268 (1996) (stating that ordinary care and good faith compliance obligations relate to Subpart C).
[54] 12 C.F.R. §229.1(b)(3).
[55] 12 C.F.R. §229.30-43.
[56] 12 C.F.R. §229.1(b)(3).

checks. *First Financial Bank, N.A. v. Citibank, N.A.*, No. 1:11-CV-226-WTL-DML, 2012 U.S. Dist. LEXIS 104883 (S.D. Ind. 2012) illustrates the interplay of the duties under Subpart C and the obligations of ordinary care and good faith that attach to the Subpart C duties as it pertains to the return and dishonor of checks.   The case makes clear that any arguments associated with failure to comply with an obligation of ordinary care must be tied to recognized duties under Subpart C.   In that case, the arguments focused on the failure to return checks expeditiously, failure to provide timely notice of dishonor, and breach of warranty for failure to meet the midnight deadline, all of which tied to specific provisions of Subpart C.[57]

40.     The depository bank in *First Financial* advanced one argument not tied to Subpart C based on allegations that the payor bank failed to investigate an earlier suspicious check, and that if it had done so the losses suffered by the depository bank could have been reduced.   The *First Financial* court had this to say about that:

> This argument is specious.   As the Court has noted several times, Citibank's liability under 12 C.F.R. §229.38(b) is for the failure to exercise ordinary care in complying with the requirements of Regulation CC.   First Financial points to no provision of Regulation CC that requires Citibank to conduct investigations into suspicious items.[58]

41.     As Subpart C is a regulation – and not a common law coverall with broad application – there is no such thing as carrying on in such a manner as to generally violate the duty of ordinary care and good faith imposed by Subpart C. Thus, a bank meets the standard of care and good faith imposed by 12 C.F.R. § 229.38(a) by complying with the specific requirements of Subpart C.[59] Likewise, conduct that falls outside of the collection of checks and

---

[57] *See id*, at *8-23 (emphasis added).
[58] Id. at *25.
[59] *See*, id., at *23-26.

other duties provided under Subpart C is irrelevant to the determination of liability for failing to exercise ordinary care or good faith.[60]

42.     So, as much as Vista Bank would like to introduce tort-based concepts like ordinary care into the check clearing process, those concepts only exist as it relates to the specific provisions of Subpart C and they do not create a common law duty running from one competing bank to another.

**C.     Vista Bank's Claims Don't Measure Up Under the Law.**

43.     Vista Bank only asserts one claim based on an alleged breach of Subpart C of Regulation CC, but it purports to tie three other common law claims into that regulatory framework.[61]   As 12 C.F.R. §229.38(a) explicitly provides and as the *First Financial* case demonstrates, this means that Vista Bank must tie its factual allegations of breach of the duty of ordinary care and good faith into specified duties contained within Subpart C of Regulation CC.

44.     The earliest factual allegations made by Vista Bank against FirstCapital are the following:  "On Tuesday, July 31, 2018, Dykes met with B. Burgess, First Capital's CEO, and K. Burgess,[62] FirstCapital's Chairman, and warned FirstCapital and the Burgess Brother Defendants of Ford's impending legal action, Reagor-Dykes' severe financial problems, and Reagor-Dykes' planned bankruptcy filing."[63]   Everything else Vista Bank alleges pertaining to First Capital in its Original Complaint  relates to the steps taken from that point forward by FirstCapital to protect its own interests as it was entitled to do.

45.     From this slender predicate, Vista Bank draws sweeping conclusions that FirstCapital violated its duties of care and good faith under Subpart C by utilizing non-public,

---

[60] *See, id,* at *24 -25.
[61] Count 1 (Breach of Federal Reserve Regulation CC), Count 3 (Fraud by Nondisclosure), Count 4 (Negligence), Count 5 (Gross Negligence), and request for attorney's fees.
[62] This assertion is demonstrably false as Ken Burgess was several hundred miles away.  Nonetheless, FirstCapital accepts the assertion as true for purposes of this motion.
[63] Original Complaint, ¶32.

insider information, concealing knowledge of fraud at Reagor Dykes, benefiting from inside information to the detriment of Vista Bank, failing to accurately represent the ability of Reagor-Dykes to pay checks, knowingly advancing Reagor-Dykes' unlawful business practices, failing to pay the Reagor Dykes checks, freezing Reagor-Dykes accounts, gaming the check clearing system, and acting with conscious indifference to Vista Bank.[64]   None of these conclusions satisfy the pleading standards under Rule 8 and Rule 9(b) of the Federal Rules of Civil Procedure.[65]

46.     Even if all of these conclusions were true, none of it relates to a duty recognized under Subpart C of Regulation CC. These are arguments that the *First Financial* court would label as specious for having nothing to do with Subpart C and the Court should dismiss the claims associated with those arguments for failure to state a claim.

**D.      Courts Dismiss *All* Claims and Defenses that Don't Satisfy the UCC or Subpart C.**

47.     To start with, courts routinely and uniformly hold that a bank owes no duty to someone who is not a customer and with whom the bank does not have a relationship.[66] Further,

---

[64] *See*, Original Complaint, ¶¶55, 64, 65, 66, 68, 69, 72.

[65] *See generally*, ¶¶ 13 through 18, *supra.*

[66] *See, e.g., Owens v. Comerica Bank*, 229 S.W.3d 544, 547 (Tex. App.–Dallas 2007, no pet.) ("To maintain a negligence cause of action, a plaintiff must establish a duty owed to it by the defendant . . . Generally a bank owes no duty to someone who is not a customer and with whom the bank does not have a relationship"); *Guerra v. Regions Bank*, 188 S.W.3d 744, 747 (Tex. App.–Tyler 2006, no pet.) (holding that because the plaintiff was not a customer of the bank and had no other relationship with the bank, the bank owed no duty to the plaintiff as a matter of law); *Ennis State Bank v. Heritage Bank*, No. 10-02-226-CV, Tex. App. LEXIS 4355, at *2-3 (Tex. App. - - Waco, May 12, 2004,  pet. denied), at *2-3 (no duty between banks and no duty to discover check kite);  *Midwestern Cattle Mktg. v. Legend Bank, N.A.*, No. 4:17-CV-375-A, 2018 U.S. Dist. LEXIS 82291, at *8 (Tex. App. - - Ft. Worth, May 16, 2018, appeal pending) (bank owes no duty someone who is not a customer and with whom the bank does not have a relationship); *State Farm Bank, F.S.B. v. Manheim Auto Financial Services,* No. 3:10-CV-519-L, 2010 U.S. Dist. LEXIS 80698, at *8-9 (N.D. Tex., August 6, 2010) (same);  *Frost Nat'l Bank v. Midwest Autohaus*, 241 F.3d 862, 871–874 (7th Cir. 2001); *First Nat'l Bank v. Colonial Bank*, 898 F. Supp. 1220, 1229–1233 (N.D. Ill. 1995); *Alta Vista State Bank v. Kobliska*, 897 F.2d 930, 934 (8th Cir. 1990); *Cumis Ins. Soc'y, Inc. v. Windsor Bank & Tr. Co.*, 736 F. Supp. 1226, 1233 (D. Conn. 1990); *Citizens Nat'l Bank v. First Nat'l Bank*, 347 So. 2d 964, 967 (Miss. 1977).

a bank does not owe a duty to detect and stop a check-kiting scheme to someone who is not a customer and with whom it otherwise does not have a special relationship.[67]

48.     Because the UCC and Regulation CC provide the comprehensive framework for allocating liabilities relating to the check clearing process and allocating losses from a check kite, all of Vista Bank's claims must be measured against that body of law to determine whether Vista Bank has stated a claim upon which relief can be granted.  Vista Bank has not stated claims recognized by the appropriate body of law and it cannot.

49.     These basic "no duty" principles and the UCC framework were addressed in *Midwestern Cattle Mktg., LLC v. Legend Bank, N.A.*, No. 4:17-CV-375-A, 2018 U.S. Dist. LEXIS 82291 (Tex. App. - - Ft. Worth, May 16, 2018)(McBryde, J.).  The *Midwestern Cattle* court considered the rights of a depositary bank and a payor bank upon the collapse of a check kite.  It noted that under Texas law, "a bank does not owe a duty to detect and stop a check-kiting scheme to someone who is not a customer of a bank or does not otherwise have a special relationship."[68] That court also stated that, "This in keeping with Texas's recognition that the UCC has the objective of promoting certainty and predictability in commercial transactions . . . Recognizing a UCC duty owed to one outside the UCC scheme would be contrary to the UCC's goals."[69]

50.     The *Midwestern Cattle* court then granted summary judgment against the depositary bank's claims under the UCC, as well as those for negligence, negligence per se, gross negligence, money had and money received, unjust enrichment, fraud, negligent

---

[67] *See e.g., Ennis State Bank,* 2004 LEXIS 4355, at *5 (rejecting claims that the UCC supports an independent action for breach of good faith and that there is some other independent general duty of care to stop a check-kiting scheme); *Wells Fargo Bank, N.A. v. Citizens Bank of Tex. N.A.*, 181 S.W.3d 790, 804 (Tex. App.–Waco 2005, pet denied) (§ 1.203 (now § 1.304) does not provide an independent cause of action to detect and stop a check-kiting scheme or any other duty of care to a non-customer absent a special or confidential relationship).
[67] *Midwestern Cattle*, 2018 U.S. Dist. LEXIS 82291, at *11.
[68] *Midwestern Cattle*, 2018 U.S. Dist. LEXIS 82291, at *7
[69] *Id.* at *8.

misrepresentation, conspiracy, and aiding and abetting.[70]  The only claim left alive was a claim under the Texas Uniform Fraudulent Transfer Act, but the court dismissed that claim by separate order the following month.[71]

51.    The *Midwestern Cattle* court cited another notable opinion, *Wells Fargo Bank, N.A. v. Citizens Bank of Texas, N.A.* 181 S.W.3d 790, 804 (Tex. App. - - Waco 2005, pet.denied). That action involved four batches of checks involved in that case.   Two of the batches were returned before the midnight deadline by the payor bank so the court easily disposed of those claims in favor of the payor bank. As to these checks the court said:  "Thus, it is undisputed that Wells Fargo Texas forwarded the first and third batches of checks to the Federal Reserve Bank before its midnight deadline.  Therefore, there is no evidence that Wells Fargo Texas failed to 'exercise ordinary care' with respect to these checks."[72]   It is undisputed in this case that FirstCapital timely returned the two batches of checks totaling $6,277,808.41 that Vista Bank sues to collect, so consistent with the *Wells Fargo* holding all of Vista Bank's claims should be dismissed.

52.    Another  notable  opinion  cited  by  the  *Midwestern Cattle*  court  was  *Ennis State Bank v. Heritage Bank*, No. 10-02-226-CV, 2004 Tex. App. LEXIS 4355 (Tex. App. - - Waco, May 12, 2004, pet. denied).   That case, like this one, involved a depository bank and a payor bank.   The  depository  bank  sued  the  payor  bank  for  dishonoring  checks  presented  to  it contending that the payor bank owed the depository bank "a duty of good faith under the UCC and a general duty of care to stop the check kiting scheme."   The court stated that, "Generally, one  bank  does  not  have  any  duty  to  discover  a  check  kite  [and]  absent  any  fiduciary  or confidential relationship or some other legal duty, one bank had no duty to inform the other that

---

[70] *Id*. at *7-15.
[71] *See* Appendix, Exhibit B, at 043.
[72] *Wells Fargo*, 181 S.W. at 803.

a customer was kiting checks."[73]   The court also analyzed the UCC provision imposing a good

faith obligation and held that it "does not support an independent cause of action for failure to

perform or enforce in good faith.  It does not create a duty where none previously existed."[74]

      53.     These three Texas courts cite numerous cases from other jurisdictions standing for

the basic proposition that in the context of a check kiting scheme competing banks are entitled to

look out for their own best interests.

      54.     One of those cases is *Citizens National Bank v. First National Bank*, 347 So. 2d

964 (Miss. 1977), a Mississippi Supreme Court case that is cited in almost every other case that

addresses issues surrounding the allocation of losses surrounding a check kite.  In that case, First

National discovered a check kite by its customer.   First National did not immediately notify

Citizens National, a competing bank that also had accounts belonging to the kiter.   Instead, First

National began returning checks drawn on the kiter's accounts at Citizens National.   Citizens

National sued for an alleged conversion by First National to recover approximately $500,000

Citizens lost because of the return of the kiter's checks.   Citizens also asserted claims for

restitution and constructive trust.

      55.     The *Citizens National* court said the following:

> These two banks were competitors in the banking field and ordinarily banks deal
> with each other at arm's length.   The bill does not allege any circumstances or
> facts that tend to show that a confidential or fiduciary relationship existed
> between these two banks, neither does it show that there is any requirement in the
> banking field that one bank notify another of its discovery of a customer kiting
> checks.   In the absence of a fiduciary or confidential relationship, or some other
> legal duty, First National Bank had no duty to inform Citizens National Bank that
> Duran was kiting checks.   *That being true, we are of the opinion that First
> National Bank had the legal right to continue to accept for deposit checks drawn
> by Duran on accounts at Citizens National Bank and present those checks for
> payment.   At the same time, First National Bank had the legal right to refuse to*

---

[73] *Id.* at *2-3.
[74] *Id*. at *4-5.

*pay checks drawn by Duran on accounts in First National Bank and deposited in Citizens National Bank.*[75]

56.     The *Citizens National* court dismissed all the claims against First National holding that "First National Bank had a legal right to do the things it did for its own protection."[76]

57.     Another frequently cited case is *First National Bank v. Colonial Bank*, 898 F. Supp. 1220 (N.D. Ill. 1995).   In that case, First National Bank suspected its customer was engaged in check kiting.   Even though First National knew more investigation was required to confirm the check kiting scheme, it immediately closed accounts and began returning checks presented by Colonial Bank for payment on the mutual customer's account.   Colonial Bank contended that First National Bank breached its duty of good faith, but the court noted that "a bank has no good faith obligation to disclose a suspected kite or to refrain from attempting to shift the kite loss."[77]   Further, the court rejected arguments that First National was unjustly enriched.[78]

58.     The *Colonial Bank* court said of the defendant bank, "At most, First National took advantage of these laws and regulations to attempt to shift the kite loss onto Colonial.   But even if this is what happened, such conduct does not constitute bad faith."[79]

59.     The same is true here.   The allegation that Rick Dykes alerted FirstCapital "of Ford's impending legal action, Reagor-Dykes' severe financial problems, and Reagor-Dykes' planned bankruptcy filing"[80] during the evening of July 31st and this led FirstCapital to work all

---

[75] *Citizens National,* 347 So. 2d at 967 (emphasis added).
[76] *Id.* at 969.
[77] *Colonial Bank,* at 1230.
[78] *Id.* at 1228.
[79] *Id.* at 1232.
[80] Original Complaint, ¶32.

night "in a greedy attempt to ram return items onto Vista"[81] does not give rise to a legal claim. First Capital acted quickly and prudently, as it should have, on behalf of FirstCapital to return as many checks as it could before the expiration of the midnight deadlines on July 31st (unsuccessfully as it turns out) and on August 1st and on August 2nd (both successfully).  By the August 1st midnight deadline, Ford Motor Credit's lawsuit against nine Reagor-Dykes entities had been on file for over 24 hours[82] and six Reagor-Dykes entities filed for bankruptcy relief earlier in the day.[83]  So, regardless what information FirstCapital learned from Rick Dykes on the evening of July 31st there was plenty of public information about serious financial problems at Reagor-Dykes throughout the course of the day on August 1st.  Vista Bank admits it knew of Reagor-Dykes' problems during the course of the day on August 2nd, so no matter what arguments Vista Bank wants to make it certainly cannot complain about the checks FirstCapital returned by midnight on August 2nd.

60.    But none of that matters anyway.  Taking all of Vista Bank's allegations as true, they do not entitle Vista Bank to relief as FirstCapital was entitled to protect itself even if it meant Vista Bank would absorb losses.  Thus, the Court should dismiss all the claims asserted by Vista Bank for failure to state a claim.

**E.    Vista Bank Seeks to Recover Damages for Checks FirstCapital Timely Dishonored.**

61.    Vista Bank limited its damages claims to an unspecified number in excess of $6,000,000,[84] despite the fact it recites receiving notice of dishonor for checks it received on August 2nd totaling $5,536,111.63, and on August 3rd totaling $3,465,809.56, for a total of

---

[81] Original Complaint, ¶40.
[82] Original Complaint, ¶33.
[83] Original Complaint, ¶34.
[84] *See* Original Complaint, ¶¶41, 42, and 48.

$9,001,921,19.[85]   Vista Bank realizes it must subtract from this total, $2,724,112.78 for the checks that it can pursue through the Federal Reserve for $2,724,112.78 because FirstCapital did not meet the midnight deadline.  Hence, the total losses Vista Bank seeks to force on FirstCapital through this lawsuit are for those checks dishonored by FirstCapital before the midnight deadline on August 1st and August 2nd.  Those checks total $6,277,808.41.  FirstCapital met its strict liability obligation to meet the midnight deadline as it relates to those checks and Vista Bank has no legal basis to seek the recovery from FirstCapital for those dishonored checks.  VistaBank's remedy is to pursue those claims against Reagor-Dykes.

**F.   No Basis Exists for Vista Bank to Recover Punitive Damages or Attorney's Fees.**

62.   Vista Bank seeks punitive damages and attorney's fees.  Since none of their underlying claims are legally viable, neither can Vista Bank recover punitive damages or attorney's fees.

### III.   CONCLUSION

63.   None of the claims asserted in this case are claims recognized by the law.  The provisions of the UCC and applicable regulations determine the outcome of this case.  The claims asserted by VistaBank relate to checks dishonored and returned by FirstCapital by its midnight deadline.  It does not matter if FirstCapital learned of the potential for a check kite earlier than Vista Bank did.  It is always the case in the collapse of a check kite that the bank "left without a chair" is the bank that was slow to learn what was going on.  Nothing in the law requires FirstCapital to look out for the best interests of VistaBank; in fact, the law compels FirstCapital to look out for its best interests.

---

[85] Original Complaint, ¶¶20, 35, 44, 51, 59, 62, 76.

Respectfully submitted,

SPROUSE SHRADER SMITH PLLC
Joel R. Hogue, State Bar No. 09809720
joel.hogue@sprouselaw.com
John Massouh, State Bar No. 24026866
john.massouh@sprouselaw.com
M. Chase Hales, State Bar No. 24083124
chase.hales@sprouselaw.com
701 S. Taylor, Suite 500 (79101)
P.O. Box 15008
Amarillo, Texas   79105
(806) 468-3300; (806) 373-3454 fax


 */s/ Joel R. Hogue*
Joel R. Hogue

**ATTORNEYS FOR DEFENDANTS,
FIRST BANCSHARES OF TEXAS, INC., AND
FIRSTCAPITAL BANK OF TEXAS, N.A.**

## CERTIFICATE OF SERVICE

I hereby certify that on September 18, 2018, I electronically filed the foregoing document with the clerk of court using the electronic filing system.  The electronic filing system will send a "Notice of Electronic Filing" to the following attorney(s) of record who have consented in writing to accept this Notice as service of this document by electronic means:

| | |
|---|---|
| Fernando M. Bustos, Esq. | |
| E-mail: fbustos@bustoslawfirm.com | *Via* E-service |
| Matthew N. Zimmerman | |
| E-mail: mzimmerman@bustoslawfirm.com | *Via* E-service |
| Deirdre Kelly Trotter | |
| E-mail: dtrotter@bustoslawfirm.com | *Via* E-service |
| BUSTOS LAW FIRM, P.C. | |
| P.O. Box 1980 | |
| Lubbock, Texas 79408-1980 | |

**ATTORNEYS FOR VISTA BANK**

*/s/ Joel R. Hogue*
Joel R. Hogue

1066089_1.docx/4739.362