**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**LUBBOCK DIVISION**

| | | |
|---|---|---|
| **VISTA BANK,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **Civil Case No: 5:18-cv-00204-C** |
| **FIRSTCAPITAL BANK OF TEXAS,** | § | |
| **N.A., and BRAD BURGESS,** | § | |
| | § | |
| **Defendants.** | § | |

**PLAINTIFFS' SECOND AMENDED COMPLAINT**

Pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), Plaintiff Vista Bank ("Plaintiff" or "Vista") files this, its Second Amended Complaint, against Defendants FirstCapital Bank of Texas ("FirstCapital"), and Brad Burgess ("B. Burgess"), collectively referred to as the "Defendants", and in support thereof, would respectfully allege as follows:

**I.**
**PRELIMINARY STATEMENT**

This action arises from FirstCapital knowingly facilitating and supporting the continuation of a multi-million dollar check kiting scheme initiated by the Reagor-Dykes entities[1] to enable FirstCapital to continue to collect fraudulent deposits, while actively pushing fraud losses onto Vista through a system of mass check returns. Vista files this lawsuit to recover more than $6,000,000.00 in damages maliciously inflicted by FirstCapital and B. Burgess through improper use of non-public, material inside information. FirstCapital and B. Burgess obtained insider knowledge through a close relationship with Rick Dykes, an owner in the Reagor-Dykes entities while also

---

[1] "Reagor-Dykes" entities include Reagor-Dykes Motors, LP (dba Spike Dykes Ford Lincoln, Reagor Dykes Auto Mall of Midland, Prime Capital Auto Lease – Lamesa, Prime Capital Auto Lease – Midland), Reagor-Dykes Floydada, LP, Reagor-Dykes Plainview, LP, Reagor-Dykes Auto Company, LP, Reagor-Dykes Amarillo, LP, Reagor-Dykes Imports, LP, and other related and affiliated entities.

being a major shareholder, Advisory Board Member, and former Board Member of FirstCapital. Dykes was at one time a board member of FirstCapital but later, to get around banking Regulation O, Dykes was moved to an "advisory" role with the board.  According to Dykes, after the transition to an advisory role, his role as a board member didn't change at all except for his title. Thus, he remained a constructive director of FirstCapital. Using this non-public information provided by Dykes, FirstCapital benefited from the continuation of the Reagor-Dykes' check kiting scheme at Vista's expense.

Recent discovery has also proved that FirstCapital loaned Reagor-Dykes' CEO Bart Reagor and its CFO, Shane Smith, millions of dollars after the Reagor-Dykes entities filed for bankruptcy. These inexplicable loans were done despite the material adverse change to Reagor and Smith's financial wherewithal. As there could be no reasaonbly prudent explanation for loaning these key corporate officers of Reagor-Dykes millions of dollars, even after the fallout was publically known, these suspect loans provide proof of the Defendants' insider knowledge and benefit from multiple parties' wrongdoing. By this Complaint, Vista seeks redress for the substantial harm incurred because of FirstCapital's unlawful conduct.

## II.
## PARTIES

### A.      Plaintiff.

1.      Plaintiff Vista Bank is a Texas financial institution duly formed and existing under the laws of the State of Texas. Vista maintains its principal office in Lubbock, Texas.

### B.      Defendants.

2.      Defendant FirstCapital Bank of Texas, N.A. is a Texas financial institution and may be served through its Board of Director's Chairman, Kenneth L. Burgess located at 805 North Big Spring, Midland, Texas 79701 or wherever he may be found.

3.      Defendant Brad Burgess is an individual and a resident of the State of Texas. B. Burgess

may be served with process at 8611 Indiana Avenue, Lubbock, Texas 79413, or wherever he may

be found.

## III.
## JURISDICTION AND VENUE

4.      Jurisdiction in this Court is proper pursuant to 28 U.S.C § 1331 because Vista's claim for

violation of the Federal Reserve System issued Regulation CC, arise under federal law. This Court

has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Vista's state law claims because

those claims are so related to the federal claims that they form part of the same case or controversy.

5.      Pursuant to 28 U.S.C. § 1391, venue is proper in the United States District Court for the

Northern District of Texas, Lubbock Division, because a substantial part of the events or omissions

giving rise to the claims asserted herein occurred within this district and division, and the Court

has personal jurisdiction over Defendants.

## IV.
## RELEVANT FACTUAL BACKGROUND

**A.      The Check Clearing Process and How it Should Work**.

6.      An understanding of the normal check clearing process between banks provides context to

Defendants' illegal actions against Vista.

7.      <u>Payor Bank and Collecting Bank</u>. When a banking customer deposits a check (also referred

to as an "item") drawn from her account at one bank (the payor bank, "Bank 1"), into her account at

another bank (the collecting bank, "Bank 2"), the two banks work with the United States Federal

Reserve Bank (the "Federal Reserve") to transfer account funds from Bank 1 to Bank 2 to clear the

item. For example, when Ms. Smith writes a $100.00 check from her account at Bank 1 and deposits

this $100.00 check into her account at Bank 2, Bank 2, as the collecting bank, sends the $100.00

deposited item to Bank 1, the payor bank, through the Federal Reserve cash letter system, as explained below.

9.    <u>The Cash Letters</u>. Funds related to items change hands among different banks though cash letters issued to and from the Federal Reserve. The cash letters a bank sends to the Federal Reserve are "outgoing" cash letters and include all items deposited at that bank which are payable by other banks. The cash letters the Federal Reserve sends to a bank are "incoming" cash letters and list the items payable by that bank which were deposited at other banks.

10.    A collecting bank, in this example Bank 2, holding a deposited item payable by Bank 1, includes the item as part of an outgoing cash letter to the Federal Reserve. The outgoing cash letter requests funds from the payor bank (Bank 1) from the account the item is drawn on. Bank 2's outgoing cash letter will include multiple items it holds related to transactions involving other banks.

11.    Upon the Federal Reserve's receipt of Bank 2's outgoing cash letter, it uses the listed items' routing numbers to determine which financial institutions should pay the items to Bank 2 (*e.g.*, for Ms. Smith's check, Bank 1 needs to pay Bank 2). The Federal Reserve then prepares an incoming cash letter to Bank 1 listing all of the items submitted for payment from accounts held at Bank 1, including Ms. Smith's check for $100.00.

12.    When Bank 1 receives the Federal Reserve's incoming cash letter, Bank 1 pairs the listed items with the correct accounts and subtracts the indicated amounts from those accounts using the account number printed on each item; however, if Bank 1 is unable to or refuses to pay any item on the incoming cash letter for a valid reason as defined by the Federal Reserve (*e.g.*, the item is subject to a stop payment, a frozen account, or an account with insufficient funds to cover the full

item amount), Bank 1 may return the check to Bank 2 as "not paid" by including the item on an outgoing return cash letter to the Federal Reserve.

13.     The Federal Reserve receives Bank 1's outgoing return cash letter and issues an incoming return cash letter to Bank 2, listing all "not paid" return items for which Bank 2 had requested payment.

14.     This incoming return cash letter to Bank 2 will include a front and back copy of each returned check. Using the incoming return cash letter's check copy, Bank 2 determines which account initially received credit for the returned check when originally deposited, and then subtracts the money from the account using a process called chargeback.

15.     The Chargeback Process. A "chargeback" reverses any account credit the collecting bank (Bank 2) previously provided to the depositing account holder for a returned item, forcibly removing funds from the account into which the item was deposited. Specifically, a chargeback is the reversal of a prior outbound cash letter and any related transfer of funds into a customer's bank account.

16.     The Federal Reserve requires that the chargeback process occur within four days of the item being negotiated at Bank 2 for the return to be considered timely:

> Day 1: Ms. Smith deposits the check from Bank 1 into her account at Bank 2, and Bank 2 sends the resulting outgoing cash letter to the Federal Reserve, providing a credit to Ms. Smith's Bank 2 account increasing the balance by the amount of the check.
>
> Day 2: Bank 1, as the issuing bank, receives the incoming cash letter from the Federal Reserve, and the amount of the item on the check is subtracted from Ms. Smith's Bank 1 account.
>
> Day 3: If Bank 1 decides not to pay the item and return it to Bank 2 as unpaid, Bank 1 lists the returned items on its outgoing cash letter to the Federal Reserve.
>
> Day 4: Bank 2 receives the incoming return cash letter from the Federal Reserve containing all items that were not paid. Bank 2 reverses the credit in Ms. Smith's Bank 2 account, reducing the account balance by the amount of the check.

17.     Any item Bank 1 returns outside of the four-day process described above is considered a late return under the Uniform Commercial Code ("UCC") and Federal Reserve guidelines, normally preventing Bank 1 from avoiding paying the item to Bank 2. This process is further illustrated in the graphic below:



**B.    How a Check Kiting Scheme Exploits the Check Clearing Process**.

18.     <u>Check Kiting</u>. Check kiting is a form of check fraud that exploits the chargeback time frame. When a collecting bank (Bank 2) receives deposit of an item, it increases the available balance in the customer's account by the item amount; however, the collecting bank will not receive actual funds on account of the item until the check clearing process is completed through cash letters with the Federal Reserve and payment by the payor bank (Bank 1). If the account holder withdraws funds credited to her account for an item before the payor bank receives the incoming return cash letter

returning that item, the account holder can receive cash on the account of the returned item, even where the item has no cash value due to Bank 1's refusal to pay on the item.

19.     Check kiting allows the account holder to withdraw non-existent funds from their account. In this way, instead of being used as a negotiable instrument, checks are misused as a form of unauthorized and fraudulently procured credit.

20.     Check kiters use accounts at two or more banks, intentionally writing worthless checks from their unfunded account at the payor bank (Bank 1) and depositing these "bad" checks into their account at the collecting bank (Bank 2). In the two to three days before Bank 1 returns the deposited item, Bank 2 has increased the balance in Ms. Smith's account, allowing Ms. Smith to withdraw $100.00 on the account into which the item was deposited. When Bank 2 receives the incoming return cash letter and charges back Ms. Smith's account, there is nothing in the account to fund the chargeback. As a result, Bank 2 has extended Ms. Smith $100.00 of credit on the account of the returned item.

21.     As detailed below, Reagor-Dykes perpetrated a multi-million dollar check kiting scheme. FirstCapital leveraged its insider connections with Reagor-Dykes ownership and management to game the system to allow FirstCapital to continue to collect on fraudulent deposits, while imposing the resulting losses, totaling over $6,000,000.00, onto Vista.

### C. The Reagor-Dykes Check Kiting Scheme against Vista.

22.     Reagor-Dykes utilized its close relationship and multiple accounts with FirstCapital to execute a massive check kiting scheme against Vista. Reagor-Dykes implemented its check kiting scheme through serial multi-million-dollar check deposits among its accounts at FirstCapital, Vista, and other banks. However, as detailed below, FirstCapital exploited its special insider relationship with Dykes-Reagor-Dykes' co-owner and FirstCapital Advisory Board Member,

major shareholder, and former Director—to improperly shift the scheme's fraud and cause injury to Vista.

23.    Initially, the Reagor-Dykes scheme resembled the example detailed above. Reagor-Dykes management maintained multiple checking accounts at multiple financial institutions, including accounts at FirstCapital and Vista. Reagor-Dykes initiated a practice of regularly writing and depositing a high-volume of large denomination checks among these accounts.

24.    Reagor-Dykes wrote multi-million-dollar checks from FirstCapital accounts, deposited these checks into Vista accounts, and then issued payments from the Vista accounts based on these deposits to cover obligations or make deposits to their accounts at another financial institution. In doing this, Reagor-Dykes obtained millions of dollars in unauthorized credit from Vista during the "float" period while Vista completed the cash letter process with the Federal Reserve and waited for FirstCapital to fund the deposited items.

25.    The scheme's cycle of deposits and fraudulent float credit survived only if Reagor-Dykes maintained the volume and speed of its deposit cycle to keep ahead of the check clearing and cash letter process; however, a disruption such as Reagor-Dykes filing bankruptcy would cut the cycle, reveal the fraud, and lead Vista to freeze its Reagor-Dykes accounts. Vista would return the items Reagor-Dykes wrote on its Vista accounts and initiate returns on the FirstCapital checks Reagor-Dykes deposited to prevent unauthorized credit advances. And that's exactly what happened— except that FirstCapital found a way to use its insider access to Dykes to channel over $6,000,000.00 in losses and damages to Vista, allowing FirstCapital to knowingly profit from the scheme by continuing to accept funds from fraudulent deposits while implementing mass returns and chargebacks onto Vista.

26.     In January of 2018, Reagor admitted in a meeting with his employees that Reagor-Dykes had to pay $25 million in a period of only four days to an undisclosed creditor following a floorplan inventory in March of 2017. As stated herein, B. Burgess informed Dykes more than once in 2017 of account overdraft problems. Additionally, FirstCapital was a significant floorplan financier of Reagor Auto Mall, Reagor-Dykes' most lucrative dealership.

### D. FirstCapital's Source of Insider Information.

27.     Rick Dykes ("Dykes") is a co-owner of Reagor-Dykes with Bart Reagor ("Reagor"). Reagor-Dykes is a well-known regional auto dealership enterprise, with locations throughout North and West Texas.

28.     Until just before Reagor-Dykes filed bankruptcy, Dykes served as a member of FirstCapital's Board of Advisors and previously held a seat as a Director on FirstCapital's Board of Directors. In fact, FirstCapital transitioned Dykes from a Director to its Board of Advisors to avoid banking regulatory scrutiny and potentially to increase the amount FirstCapital could lend Reagor-Dykes. Dykes was told by Defendants that he was being moved from his director role due to Federal Banking Regulation O. Despite his removal as a Board member, Dykes continued his old role with no changes. Further, Dykes is a large FirstCapital shareholder, having admitted under oath on August 13, 2018 that he holds approximately 375,000 of FirstCapital's shares.

29.     Brad Burgess had at least two conversations with Rick Dykes in 2017, where Brad Burgess discussed Reagor-Dykes' overdrawn bank accounts. Thus, B. Burgess and FirstCapital were on reasonable notice of the Reagor-Dykes' check-kiting scheme as early as 2017.

30.     Reagor-Dykes maintained active deposit accounts with Vista and FirstCapital, among other banking institutions.

### E. FirstCapital Leverages its Advisory Board Member, Major Shareholder, and Former Director, Rick Dykes, to Pin the Damages onto Vista.

31.     As noted above, Dykes held high management and key ownership roles at both Reagor-Dykes and FirstCapital, serving as Reagor-Dykes co-owner and FirstCapital Advisory Board Member, major shareholder, and former Director.

32.     On or before Saturday, July 28, 2018, Ford Motor Credit Company, LLC ("Ford"), Reagor-Dyke's largest inventory-lender, notified Dykes of Ford's discovery of massive fraud and insolvency at Reagor-Dykes. Ford terminated Reagor-Dykes' funding, declared default, and threatened immediate legal action to, among other actions, seize Reagor-Dykes' assets.

33.     On Saturday, July 28, 2018, Dykes confided to a friend regarding Reagor-Dykes' insolvency and planned bankruptcy filing.

34.     Reagor-Dykes' management, including Dykes, worked with counsel through Monday, July 30, 2018 to appease Ford; however, no agreement was reached. Reagor-Dykes continued emergency bankruptcy preparations in anticipation of Ford's legal actions.

35.     On Tuesday, July 31, 2018, Dykes met with B. Burgess, Tracy Bacon, and Mike Cannon and warned FirstCapital and B. Burgess of Ford's impending legal action, Reagor-Dykes' severe financial problems (including the check-kite), and Reagor-Dykes' planned bankruptcy filing. Dykes alerted no other creditors to these facts.

36.     Also, on July 31, 2018, Ford sued nine (9) Reagor-Dykes entities and Messrs. Reagor and Dykes in the U.S. District Court for the Northern District of Texas, Lubbock Division, alleging, among other counts, bank fraud and claiming tens of millions of dollars of damages.

37.     The next day, on Wednesday, August 1, 2018, six (6) of the nine (9) Reagor-Dykes entities filed petitions for bankruptcy protection. Lacking FirstCapital's insider access, Vista did not learn

about the check-kite and learned of the Reagor-Dykes bankruptcy through local Lubbock news reports and word of mouth.

38.     The timing of these events and FirstCapital's contemporaneous and highly irregular banking transactions detailed below establish that FirstCapital and B. Burgess used the inside information Dykes provided them to act against Vista, weaponized the check clearance process and systematically foisted over $6,000,000.00 in damages onto Vista to the benefit of the Defendants.

### F.     FirstCapital Acts on Material, Non-Public Inside Information to Its Benefit and Vista's Harm.

39.     Prior to Dykes providing FirstCapital and B. Burgess key material, inside, non-public information on the Reagor-Dykes fraud, bankruptcy planning and related insolvency, FirstCapital timely cleared and paid Reagor-Dykes items deposited with Vista during normal hours, in a normal volume, with no chargebacks or anomalies.

40.     On July 31, 2018, FirstCapital, at the direction of B. Burgess, turned this process on its head, took Dykes' information and systematically targeted Vista with a flood of irregular returned and unpaid Reagor-Dykes items.

41.     As explained above, Reagor-Dykes used its numerous FirstCapital accounts to cycle a high volume of large dollar checks through its Vista accounts. As a result, Vista is party to numerous outgoing and incoming cash letters among FirstCapital and the Federal Reserve for Reagor-Dykes related checks.

42.     On Friday, July 27, 2018, Vista processed check items, including numerous Reagor-Dykes deposits, transmitting its outgoing cash letter to the Federal Reserve. On the next business day, Monday, July 30, 2018, the Federal Reserve provided the items to FirstCapital in an incoming cash letter.

43.     On a standard timeline, the following would have happened. On *Tuesday, July 31, 2018*, FirstCapital would have identified and returned any items from Vista's July 27th outgoing cash letter that FirstCapital could not, or refused, to pay by issuing an outgoing return cash letter to the Federal Reserve no later than midnight central standard time. Similarly, on *Wednesday, August 1, 2018*, no later than 2 p.m. central standard time, Vista would have received an incoming return cash letter listing FirstCapital's July 31st outgoing return cash letter items. FirstCapital deviated from this process in many important and telling ways.

44.     Acting on the damning inside information FirstCapital and B. Burgess received from Dykes on July 31st, FirstCapital, at the direction of B. Burgess, blew up the standard process and "worked all night" in a greedy attempt to ram return items onto Vista as detailed below. On August 1, 2018, at approximately 10:30 a.m. central time, Reagor-Dykes filed bankruptcy. With the exception of FirstCapital, creditors received notice later the same day through local Lubbock news sources and word of mouth.

45.     On August 2, 2018, Vista received notice of FirstCapital's return and nonpayment of seventy-nine (79) Reagor-Dykes' items totaling $5,536,111.63, under the return reason of "uncollected funds hold" or "UCF." Prior to FirstCapital's return of these seventy-nine (79) items, FirstCapital had never returned a single Reagor-Dykes item to Vista for nonpayment.

46.     It is telling that FirstCapital submitted such a large volume of returns in its August 1, 2018 outgoing return cash letter for at least four reasons:

> 1) FirstCapital's August 1st cash letter included thirty-eight (38) returned items from Vista's July 27, 2018, outgoing cash letter, totaling $2,724,112.78 in returns. Having missed the July 31, 2018, return deadline for July 27, 2018, dated items, these thirty-eight (38) items were late under the Federal Reserve guidelines, requiring FirstCapital to engage in the labor-intensive investigation, processing and manual entry of all such "late" returns. To have processed and submitted all these late returns on August 1st indicates that FirstCapital began processing the return of these July 27th items well before Reagor-Dykes bankruptcy filing the mid-morning of August 1, 2018. FirstCapital's use of the manual

return process alone is evidence of FirstCapital engaging in extraordinary efforts to hit Vista with return loses.

2) FirstCapital's processing and submitting the voluminous July 27th late returns on August 1st also indicates, upon information and belief, that FirstCapital initially approved these July 27th items for payment early on July 31st, but frantically reversed the course following FirstCapital's and B. Burgess meeting with Dykes later on July 31st, trying and failing to timely return these items by the July 31, 2018 Federal Reserve cutoff.

3) Of all of Reagor-Dykes banking institutions, including at least FirstCapital, IBC Bank of Oklahoma, AIM Bank and Vista, (i) only FirstCapital submitted an outgoing return cash letter on August 1st, the date Reagor-Dykes filed bankruptcy; and (ii) only FirstCapital attempted to charge back July 27, 2018, Reagor-Dykes items.

4)      Dykes himself admitted to Vista's counsel that FirstCapital's team did in fact "work all night" on July 31st and early on August 1st to accelerate and process these voluminous returns to Vista.

47.     On September 28, 2018, Ken Burgess issued a letter to the shareholders of First Bancshares of Texas, Inc., to "give an update on this situation, given the fact that FirstCapital Bank (Bank) is involved in two . . . lawsuits." This letter was made public by Defendants when a link to "an important letter from First Bancshares of Texas, Inc. CEO, Ken Burgess" was placed on FirstCapital's public website. Ken Burgess' letter stated in pertinent part:

> Simply stated, as a result of the financial condition of a group of related companies that are customers of our Bank, a lawsuit was filed on July 31, 2018 by Ford Motor Credit Company against those companies and their individual owners. On the next day, August 1, 2018, six of those companies filed for Chapter 11 Bankruptcy protection. **Immediately following these filings, our Bank took internal steps to protect our Bank, our customers and our shareholders from what we had determined was a possible check kiting scheme that had apparently been orchestrated by someone internally associated with those companies.** Despite our efforts, various banks, including ours, sustained losses in this process. So far, two of the harmed banks have sued our Bank, as well as Brad Burgess and me. Our Bank's position is that none of the claims made by those two banks against the three of us are supported by any of the applicable laws that govern banks in situations such as this.

(emphasis added).

48.    The above-highlighted language from Defendants' letter to its shareholders contains false and misleading information. It insinuates that Defendants only took action after the Reagor-Dykes bankruptcy filings. However, as detailed above, Defendants took actions to return items to Vista immediately upon gaining non-public insider knowledge after the meetings conducted between Dykes and the Defendants on July 31st, 2018, the day before the bankruptcy filings. Ken Burgess' misleading statements to FirstCapital's shareholders further corroborates Defendants' intentions and utilization of nonpublic insider information to shield itself and ensure that any accompanying losses would be placed on other financial institutions. Defendants' actions were prompted by more than minimizing losses to FirstCapital from the check-kite: as significant shareholders in FirstCapital's holding company, B. Burgess's personal wealth would decrease sharply in direct correlation with a decrease in FirstCapital's stock value; and FirstCapital's stock and cash acquisition of Fidelity Bank would have required a significantly larger cash infusion from FirstCapital had the whole truth come out at this critical time. Not only was it important for FirstCapital to protect its stock price for the Fidelity Bank acquisition, but on information and belief, the Fidelity Bank acquisition was merely a stepping stone as part of FirstCapital's plan to become a publicly traded bank.

49.    In summary, the evidence is clear that FirstCapital and B. Burgess': (i) directly received material, non-public, inside information from Dykes, acting as both a Reagor-Dykes insider and a FirstCapital insider; (ii) intentionally and immediately acted on this information to damage Vista; and (iii) fraudulently presented items for payment as detailed in the next section.

       **G.    The Defendants' Actions Intentionally Damaged Vista by at Least $6,000,000.00**.

50.    FirstCapital's and B. Burgess' actions in conspiring with their friend and FirstCapital insider, Dykes, directly, knowingly and intentionally damaged Vista. As banking system

professionals, the Defendants understood well the check clearing and chargeback process and how to exploit its timing to ensure FirstCapital continued to collect funds from fraudulent Reagor-Dykes deposits into its accounts while Vista absorbed the damages for the Reagor-Dykes bankruptcy and check kiting collapse. FirstCapital and B. Burgess weaponized the check clearance process and systematically foisted over $6,000,000.00 in damages onto Vista.

51.     First, by accelerating the mass return, including the manual late return, of millions of dollars in Reagor-Dykes items to Vista on July 31st and August 1st, FirstCapital and B. Burgess acted on Dykes' inside information to accelerate and exploit Vista's exposure to the Reagor-Dykes scheme, while intentionally depriving Vista of any opportunity to avoid accepting Reagor-Dykes deposits from FirstCapital, deposits FirstCapital knew it would never honor.

52.     Second, on information and belief, FirstCapital prematurely froze payments from Reagor-Dykes' FirstCapital bank accounts, before any bankruptcy filing, even when these accounts otherwise held available funds to pay items on Vista's July 27th and 30th outbound cash letters. Upon information and belief, at the same time FirstCapital initiated return of Reagor-Dykes' items to Vista, FirstCapital had approximately $8,500,000.00 in Reagor-Dykes funds from which to pay Vista on these items. Instead of paying Vista as it should have, and in furtherance of its scheme to harm Vista for its own benefit, FirstCapital froze all Reagor-Dykes funds and returned Reagor-Dykes' checks with the reason of "uncollected funds hold".

53.     FirstCapital's use of the uncollected funds hold or "UCF" reason, indicating pending but forthcoming funds, as opposed to the "NSF" reason, indicating an unfrozen account that lacks sufficient funds, further supports the conclusion that FirstCapital intentionally withheld Reagor-Dykes accounts to avoid paying Vista. Furthermore, FirstCapital's use of the "UCF" reason on the returned checks, which suggests that adequate funding is pending but simply not *yet*

unavailable, rather than the "NSF" or "Frozen Account" codes FirstCapital could have used, constitute an intentional attempt to deceive Vista into believing that there was nothing to be worried about as to the eventual collection of these funds and the maker's solvency.

54.     On August 3, 2018, Vista received fifty (50) more items totaling $3,465,809.56, which were returned for non-payment from FirstCapital, drawn off accounts belonging to Reagor-Dykes entities. Of those items, forty-seven (47) items totaling $3,294,354.25 were returned under the reason "uncollected funds hold," and only three (3) items totaling $171,455.31 were returned for insufficient funds.

55.     In total, FirstCapital's and B. Burgess' actions damaged Vista by actively funneling $6,000,000.00 in Reagor-Dykes chargebacks and losses onto Vista, allowing FirstCapital and B. Burgess to improperly profit from its close relationship with Dykes, a large FirstCapital shareholder, Advisory Board Member and longtime former FirstCapital Director.

56.     In fact, FirstCapital now hides its close relationship and long history with Dykes, covering its tracks and disassociating itself from Dykes by deleting evidence of this relationship from its website. It appears FirstCapital has already received all it needs from Dykes.

57.     Further, while FirstCapital knowingly allowed Vista to advance funds on account of fraudulent Reagor-Dykes items, FirstCapital itself received over $7,500,000.00 in funds Vista advanced and paid (without return) as a payor bank on Reagor-Dykes items payable from a Vista held account and deposited at a FirstCapital held account. Thus, by allowing the fraud to advance, FirstCapital directly collected (and prevented timely return of) over $7,500,000.00 in Vista payments on Reagor-Dykes items– items that Vista could have returned if it possessed the same advanced knowledge as FirstCapital.

58.   Vista files this lawsuit to recover over $6,000,000.00 in damages FirstCapital and B. Burgess inflicted on Vista through the Defendants' improper use of material, non-public, inside information to benefit from the Reagor-Dykes' check kiting scheme.

### H.   Defendants Demand Fraudulent Transfers from Reagor and Dykes

59.   After Defendants got insider knowledge from Dykes about the full extent of the Reagor-Dykes insolvency, between August 2 and August 7, 2018, in a series of three pledge agreements, Dykes pledged an additional $7.5 million in collateral to FirstCapital, approximately $2.75 million in cash and $4.7 million in FirstCapital stock (260,302 shares), and Reagor pledged currently unknown amounts in mutual funds to FirstCapital. In return, FirstCapital agreed to provide an additional $2.1 million in floorplan financing for the Reagor Auto Mall ("RAM") dealership (which was the highest performing Reagor-Dykes dealership).

60.   On August 6, 2018, a letter from Mr. John Massouh, an attorney for FirstCapital, was sent to Mr. David Langston, then counsel for various Reagor-Dykes entities, to set forth a proposed pledge on additional assets for Reagor and Dykes in exchange for $2.1 million in additional floorplan financing. Reagor, Dykes, and their spouses signed the pledge agreement. However, FirstCapital stopped floorplan financing Reagor-Dykes on Monday, July 30.

61.   Putting its profitability first, FirstCapital did not advance any Reagor-Dykes entity any of the additional $2.1 million in floorplan financing, despite the additional pledges of collateral, by fraudulently taking this additional collateral and promises to do so. By doing so, FirstCapital sealed the demise of the Reagor-Dykes Auto Group and ensured that hundreds of its employees would lose their jobs. This also deprived other creditors, like Vista Bank, of the ability to recover for the damages they suffered, while lining the pockets of FirstCapital. This is another example of

FirstCapital using its insider relationship with Mr. Dykes to the detriment of all others, as FirstCapital pursued its quest to become a publicly traded bank.

   I.      **Millions of Dollars in Suspect Loan Money Given to Bart Reagor and Shane Smith, Even After Reagor-Dykes Implodes**

62.    Even after getting insider information in advance of the Reagor-Dykes bankrupty filings, and freezing Reagor-Dykes' bank accounts, inexplicably, FirstCapital, as authorized by B. Burgess, gave Reagor-Dykes' CEO Bart Reagor and CFO Shane Smith millions of dollars in loan money which the Defendants had to reasonably know would never be repaid.

63.    One day after the first round of Reagor-Dykes bankruptcy filings, on August 2, 2018, FirstCapital provided a home equity loan to Bart Reagor in the amount of $1,004,883.75. FirstCapital provided this money to Mr. Reagor, even though they knew the bankruptcy filings were material adverse changes to Mr. Reagors' financial wherewithal. As the Chief Executive Officer of the Reagor-Dykes entities, Bart Reagor was ultimately responsible for all operations of the companies, and he had intimate knowledge of the activities and banking practices of the businesses.

64.    FirstCapital also issued a second lien home equity loan to Shane Smith on September 21, 2018, in the amount of $395,900.00. One can reasonably assume that Mr. Smith's first mortgage on his home was paid off with these loan proceeds, given that Shane Smith had valued his property at $451,300.00 on a personal financial statement. Due to federal mortgage regulations, it is inexplicable how Defendants were able to make this loan, because they knew Mr. Smith had been fired from his job and accused of criminal wrongdoing and would not be able to provide current income verification to support this massive loan. Based on B. Burgess' conversations with Dykes, the Defendants also had knowledge that Shane Smith was the supposed mastermind of the check-kiting scheme that damaged Vista Bank and other innocent banks.

65.    The Defendants' personnel worked intimately with Reagor-Dykes' personnel, including its CFO, Shane Smith, and were aware of information as early as 2017 that would lead Defendants to conclude that Reagor-Dykes was operating a check-kiting scheme. The Defendants absolutely knew full well of the check-kiting scheme no later than July 31, 2018.

66.    As there could be no reasonable banking rationale for giving millions of dollars in cash to Bart Reagor and Shane Smith after the bankruptcy filings, one can reasonably deduce that these payments were given to these men to help finance their legal defense funds, and to reward them for their involvement with Defendants' banking operations. Reagor Auto Mall was the crown jewel of the Reagor-Dykes auto group, and FirstCapital provided key floorplan financing for Reagor Auto Mall. FirstCapital and B. Burgess benefited from their banking relationships with the Reagor-Dykes companies, and Rick Dykes, Bart Reagor, and Shane Smith.

## V.
## CLAIMS FOR RELIEF

### Count 1 – Breach of Federal Reserve Regulation CC, 12 C.F.R. § 229
### (FirstCapital)

67.    Vista repeats and incorporates by reference the allegations set forth in the preceding paragraphs.

68.    The Expedited Funds Availability Act (12 U.S.C. §§ 4001-10) authorizes the Federal Reserve to impose or allocate among banks the risks of loss and liability in connection with *any* aspect of the check payment system. In cases of bad faith, damages suffered by a bank as a proximate consequence of any act or omission by another bank giving rise to a loss or liability may be imposed. 12 U.S.C. § 4010(f). The Federal Reserve has implemented this authority by enactment of Regulation CC ("Reg CC"). 12 CFR § 229.30. The United States Supreme Court has affirmed that federal courts have subject matter jurisdiction for suits brought by one bank against another financial institution for a violation of their Regulation CC duties, thus allowing

FirstCapital's violations to be enforced through a private right of action. *Bank One Chicago v. Midwest Bank & Trust Co.*, 516 U.S. 264, 272 (1996).

69.     Federal Reserve Regulation CC, 12 C.F.R § 229.38(a), the liability section for Regulation CC's subpart C, states:

> (a) Standard of care; liability; measure of damages. A bank *shall exercise ordinary care and act in good faith* in complying with the requirements of this subpart. A bank that fails to exercise ordinary care or act in good faith under this subpart may be liable to the depositary bank, the depositary bank's customer, the owner of a check, or another party to the check. The measure of damages for failure to exercise ordinary care is the amount of the loss incurred, up to the amount of the check, reduced by the amount of the loss that party would have incurred even if the bank had exercised ordinary care. A bank that fails to act in good faith under this subpart may be liable for other damages, if any, suffered by the party as a proximate consequence....

12 C.F.R. § 229.38(a) (emphasis added).

70.     FirstCapital is a "Bank" as defined by Regulation CC, 12 C.F.R. § 229.2(e), imposing a legal duty on FirstCapital to exercise ordinary care and act in good faith in the check clearance, return and Federal Reserve letter process with Vista.

71.     FirstCapital failed to exercise ordinary care and failed to act in good faith with Vista by, among other acts, (i) improperly leveraging its Advisory Board member, former Director and major shareholder's role as an insider of Reagor-Dykes to obtain material, non-public, inside knowledge of the Reagor-Dykes fraud, (ii) intentionally concealing its knowledge of the fraud to ensure the fraud continued, and (iii) used this insider knowledge to benefit from the Reagor-Dykes fraud by returning and refusing to fund Reagor-Dykes checks held by Vista that FirstCapital otherwise should have funded, forcing Vista to incur the losses for these items, and (iv) intentionally misleading Vista in stating the reason for the check returns were due to uncollected funds, as opposed to insufficient funds or a frozen account.

72.     For these, and the other improper actions detailed in this Complaint, FirstCapital breached

Federal Reserve Regulation CC, 12 C.F.R. § 229 in its dealings with Vista.

73.     FirstCapital's breaches damaged Vista in the amount of over $6,000,000.00, plus lost

interest and attorneys' fees.

## Count 2—Breach of Contract
## (FirstCapital)

74.     Vista repeats and incorporates by reference the allegations set forth in the preceding

paragraphs.

75.     Under Texas Business and Commerce Code 4.103(b), which states that federal banking

regulations have the effect of agreements between the financial institutions handling items, there

was a valid enforceable contract between Vista and FirstCapital, namely Regulation CC. As part

of Regulation CC, subpart C, Vista and FirstCapital agreed to exercise ordinary care and act in

good faith, each as to the other, in complying with the requirements of Regulation CC, Subpart C

Vista is the proper party to sue FirstCapital for breach of contract of this agreement. Vista fulfilled

its obligations under this agreement by exercising ordinary care and acting in good faith in

complying with the requirements of Regulation CC, subpart C.

76.     First Capital failed to fulfill its obligations under this agreement. In using its insider

information to offload the losses of the check kite at issue, attempting to return millions of dollars

in checks after the midnight deadline, attempting to deceive Vista at to the existence of a check

kite by using the misleading code "UCF" rather than "NSF" or "Frozen Account," and otherwise

acting in bad faith, FirstCapital failed to exercise ordinary care and good faith in meeting the

requirements of Regulation CC, Subpart C. This breach, further described above, caused Vista

injury.

### Count 3 –Liability as Beneficiary of Reagor-Dykes' Fraud
### (First Capital and B. Burgess)

77.    Vista repeats and incorporates by reference the allegations set forth in the preceding paragraphs.

78.    In perpetrating its check kiting scheme, Reagor-Dykes committed fraud against Vista by, among other actions:

a. Misrepresenting that the items Reagor-Dykes deposited with Vista were valid and payable by FirstCapital; Reagor-Dykes and its representatives who made check deposits made this misrepresentation to Vista on Vista's premises or through the mails on almost every single business-day for a period of many months and with certainty including the period from July 1, 2018, through July 31, 2018, by depositing checks with the Vista representatives who accepted and processed these deposits.

b. These misrepresentations were material in that Vista would not have made funds available to Reagor-Dykes if Vista knew the representations were false;

c. Reagor-Dykes knew the items were not payable, and that these representations to Vista were false;

d. Reagor-Dykes made the representations to Vista to induce Vista to provide Reagor-Dykes access to funds through its Vista accounts;

e. Vista relied on these representations in providing access to funds on account of these items; and

f. Vista's reliance caused it damages of at least $6,000,000.00.

79.    Defendants had actual, advanced, and insider knowledge of the Reagor-Dykes fraud, check kiting scheme, and related misrepresentations to Vista and used this knowledge to preserve the fraud long enough to enable FirstCapital and B. Burgess to pass FirstCapital's risk onto Vista, allowing

FirstCapital to retain and collect funds that otherwise it would have lost and to avoid paying funds to Vista it otherwise should have paid. Put simply, FirstCapital knowingly hid behind the Reagor-Dykes fraud while fraud-related funds flowed to FirstCapital, and FirstCapital pushed loses to Vista through FirstCapital's mass return of Reagor-Dykes checks.

80.     Due to FirstCapital's and B. Burgess' scheme to benefit from the Reagor-Dykes fraud, Vista has been damaged in the amount of over $6,000,000.00.

**Count 4 – Negligence**
**(FirstCapital)**

81.     Vista repeats and incorporates by reference the allegations set forth in the preceding paragraphs.

82.     FirstCapital owed a legal duty to timely pay items held by Vista and to otherwise comply with the cash letter, check payment and clearance process in good faith. Further, FirstCapital owed Vista a legal duty of ordinary care and good faith under Regulation CC, 12 C.F.R § 229.38(a).

83.     FirstCapital breached these duties, by, among other bad acts, negligently and prematurely freezing Reagor-Dykes accounts, taking advantage of insider information to game the check payment and return system and intentionally diverting losses to Vista.

84.     FirstCapital's actions that benefitted from the Reagor-Dykes fraud damaged Vista in an amount to be determined by the trier of fact.

**Count 5 – Gross Negligence**
**(FirstCapital)**

85.     Vista repeats and incorporates by reference the allegations set forth in the preceding paragraphs.

86.     FirstCapital engaged in its negligent activities with knowledge and a conscious indifference to the extreme degree of risk of harm that Vista would inevitably incur. Further, FirstCapital owed Vista a legal duty of ordinary care and good faith under Regulation CC, 12 C.F.R § 229.38(a).

87.     Due to FirstCapital's gross negligence, Vista has been damaged in an amount to be determined by the trier of fact, which is to include an amount associated with punitive damages.

## Count 6 – Money Had and Received
### (FirstCapital)

88.     Vista repeats and incorporates by reference the allegations set forth in the preceding paragraphs.

89.     FirstCapital collected and withheld monies payable to Vista.

90.      FirstCapital knowingly facilitated and supported the continuation of Reagor-Dykes' check kiting scheme to enable FirstCapital to continue to collect fraud-related funds and deposits while actively pushing fraud losses on to Vista through a system of mass returns, causing Vista to suffer over $6,000,000.00 in damages. This money in equity and good conscience belongs to Vista, and FirstCapital and Reagor have refused to return this money.

91.     As a result, FirstCapital should be required to pay to Vista this wrongfully withheld money.

## Count 7 – Conversion
### (FirstCapital)

92.     Vista repeats and incorporates by reference the allegations set forth in the preceding paragraphs.

93.     Vista had the legal right to possess the funds held by FirstCapital from various items and cash letters drawn from FirstCapital accounts.

94.     FirstCapital wrongfully exercised dominion over these funds.

95.     Due to FirstCapital's wrongful dominion over these funds, Vista has been damaged in an amount to be determined by the trier of fact.

### Count 8 – Unjust Enrichment
### (FirstCapital)

96.     Vista repeats and incorporates by reference the allegations set forth in the preceding paragraphs.

97.     In the alternative, and to the extent a contract does not govern the benefits received by FirstCapital as a result of its wrongful conduct, FirstCapital unjustly enriched itself at Vista's expense because of fraud and the undue advantage of having Dykes, one of its trusted  board members, major shareholder, and key executive officer of Reagor-Dykes as an insider to the check kiting scheme. Therefore, Vista asserts a claim against this money, which in equity and good conscience, belongs to Vista.

### Count 9 – Mistake and Restitution Under Tex. Bus. Com. Code § 3.418
### (FirstCapital)

98.     Vista repeats and incorporates by reference the allegations set forth in the preceding paragraphs.

99.     In the alternative, Vista should be awarded recovery of the payments it made as payor bank starting on July 30, 2018, to FirstCapital on Reagor-Dykes items drawn on Vista accounts and deposited at FirstCapital accounts. FirstCapital's simultaneous dishonor of items presented for payment by Vista, late return of checks, and misleading coding of the checks as "UCF" shows that FirstCapital cannot access the "good faith" safe harbor afforded by sub-section (c) of § 3.418. Sub-section (b)'s restitution provision applies because Vista was mistaken in its payment of these checks—a mistake that was induced by FirstCapital in that FirstCapital withheld material inside

information from Vista regarding the check kite. Vista seeks restitution for these payments in the amount of over $7,500,000.00.

### Count 10 – Fraudulent Transfers Under Texas Uniform Fraudulent Transfer Act (FirstCapital)

100.    Vista repeats and incorporates by reference the allegations set forth in the preceding paragraphs.

101.    Vista has a right to payment from Dykes and Reagor, and Dykes and Reagor are both liable to Vista due to their breached personal guarantees of Reagor-Dykes' debt and arising from the preceding facts related to the check kiting scheme. Dykes and Reagor are jointly liable to Vista.

102.    Dykes and Reagor are insolvent debtors because the sum of their debts is greater than the sum of all their assets at a fair valuation. Notwithstanding, Dykes and Reagor transferred millions of dollars in assets to FirstCapital in the form of pledges.

103.    These pledges are fraudulent transfers because FirstCapital did not give reasonable consideration, or a reasonably equivalent value in exchange for the pledges.

104.    Therefore, Vista seeks avoidance of the pledges to the extent necessary to satisfy its claims for payment against Dykes and Reagor.

### Attorneys' Fees (FirstCapital)

105.    Vista repeats and incorporates by reference the allegations set forth in the preceding paragraphs.

106.    The law requires Vista to engage counsel to represent it in the prosecution of these claims. Vista has agreed to pay its attorneys a reasonable fee for their services and is entitled to recover such fees from FirstCapital pursuant to Federal Reserve Regulation CC, Texas Civil Practice and

Remedies Code 38.001, as well as any other state or federal statute providing for the payment of attorneys' fees to the prevailing party on claims pleaded by Vista herein.

## VI.
## JURY DEMAND

107.   Vista requests that a jury be convened to try the factual issues in this case.

## VII.
## REQUEST FOR RELIEF

WHEREFORE, premises considered, Vista respectfully requests that the Court set this case for trial, and that the Court grant Vista the following relief against Defendants, as follows:

a)      Compensatory damages to be proven at trial on all issues available;

b)      Disgorgement of ill-gotten gain that Defendants received in their unlawful activity;

c)      Punitive damages to be proven at trial on all issues available based on Defendants' wrongful conduct, in an amount no less than $12,000,000, pursuant to TEX. CIV. PRAC. & REM. CODE §41.008;

d)      Vista's consequential damages based on Defendants' wrongful conduct;

e)      Avoidance of the fraudulent transfers to FirstCapital by Dykes and Reagor;

f)      Pre-Judgment and Post-judgment interest at the maximum rate allowed by law;

g)      All costs and expenses of litigation, including all reasonable and necessary attorneys' fees incurred in bringing this action; and

h)      Such other and further relief as the Court deems just and proper.

Respectfully submitted,

By:/s/ Fernando M. Bustos
   Fernando M. Bustos
   State Bar No. 24001819
   fbustos@bustoslawfirm.com
   Matthew N. Zimmerman
   State Bar No. 24100386
   mzimmerman@bustoslawfirm.com
   Dustin N. Slade
   State Bar No. 24073714
   dslade@bustoslawfirm.com
BUSTOS LAW FIRM, P.C.
P.O. Box 1980
Lubbock, Texas 79408-1980
Phone: (806) 780-3976
Facsimile: (806) 780-3800

ATTORNEYS FOR VISTA BANK

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on this date I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court, the electronic filing system sent a "Notice of Electronic Filing" to all attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

/s/ Fernando M. Bustos
Fernando M. Bustos